220 N.J. Super. 90 (1987)
531 A.2d 407
DORIS MARO AND DR. ROBERT J. MARO, PLAINTIFFS,
v.
EDWARD CHRISTOPHER POTASH, PHILADELPHIA EAGLES FOOTBALL CLUB, INC., SPECTAGUARD, INC., NILON BROTHERS, INC., AND CITY OF PHILADELPHIA, DEFENDANTS.
Superior Court of New Jersey, Law Division Camden County.
Decided June 19, 1987.
*92 Michael Patrick Mullen, for plaintiffs.
Warren William Faulk, for defendant Nilon Brothers, Inc.
HYLAND, J.S.C.
This motion presents the interesting jurisdictional question whether a New Jersey court can entertain an action by New Jersey plaintiffs for a tort committed in Philadelphia, Pa. during a Philadelphia Eagles  Atlanta Falcons professional football game.
Plaintiffs allege that Mrs. Doris Maro was assaulted by the defendant Edward Potash (coincidentally also a New Jersey resident) at Veterans' Stadium on November 10, 1985, and subsequently harrassed by him on a later date while the plaintiffs were in attendance by virtue of their being season tickets holders.
In addition to Mr. Potash, plaintiffs have also sued the Philadelphia Eagles Football Club, Inc., Spectaguard (charged with the responsibility for security at the stadium), Nilon Brothers, Inc. (refreshment and souvenir vendor) and the City of Philadelphia (owner of the stadium). The specific allegations regarding Nilon set out a "dram shop" cause of action concerning the serving of alcoholic beverages to Mr. Potash while he was also a spectator at the stadium.
*93 Nilon now moves to dismiss the complaint as to it for lack of in personam jurisdiction, since it has insufficient "minimum contacts" in New Jersey. I have deferred ruling on this motion until all discovery on this particular issue has been completed, and counsel have now cooperated in making a full record for purposes of my ruling. The following facts are stipulated or not disputed.
The stadium is owned by the City of Philadelphia and is the predominant outdoor sports facility in the so-called "Delaware Valley" area of southern New Jersey, eastern Pennsylvania and Delaware. Its major tenants are the National Football League Eagles and National Baseball League Phillies, and it also provides home game status for Temple University football and an assortment of entertainment activities including rock music concerts. Over three million patrons annually attend these events, and it is undisputed that a substantial number of these spectators are New Jersey residents.
The stadium complex is located approximately three miles from the New Jersey-Pennsylvania boundary in the Delaware River, and it is readily accessible to New Jersey residents via the Walt Whitman Bridge and a series of interstate highways. In fact, the traffic congestion attendant upon major events spreads out across the bridge and clogs New Jersey traffic arteries even for those drivers who are traveling elsewhere. Ironically, it takes less time for many South Jersey residents to travel to the stadium than it does for patrons residing within the Philadelphia city limits. At night, the glow of the stadium floodlights is clearly visible from municipalities in Camden and Gloucester Counties.
At the time of the incident in 1985, Nilon was the exclusive operator of the general concessions (as well as the Stadium Club restaurant) located at the stadium under a fifteen year lease, and it paid 35.7% of all its gross receipts from the operation of the general concessions to Philadelphia. During the lease, the city has received from Nilon millions of dollars in *94 direct revenues from its sale of food, beverages (both alcoholic and non-alcoholic), pennants, programs and all types of souvenirs and novelties.
It is not disputed that massive marketing and advertising programs are undertaken each year by the sports franchises and entertainment promoters in order to draw maximum crowds to the stadium. These efforts do not stop at the New Jersey-Pennsylvania boundary, since they are conveyed by television (including cable located in New Jersey), radio and print advertising as well as promotional techniques of all kinds. For instance, the Camden County Bar Association typically sponsors a "Night at the Phillies" for local lawyers and their families, at which time the products sold by Nilon are consumed in great numbers. It should also be noted that the beer, hotdog and other brands of refreshments sold by Nilon are extensively marketed by these companies in the Delaware Valley area. Although Nilon does not directly participate in any of this advertising and promotion, it is clearly the direct beneficiary of such interstate efforts. It is conceded that its profits are in direct proportion to the volume of activity at the stadium turnstiles.
Acknowledging all of the above, Nilon contends it still lacks sufficient activity in this state to constitute the "minimum contacts" required for jurisdiction as established in the landmark case of International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Defendant Nilon Bros., Inc. is a Pennsylvania corporation and the general partner in the Pennsylvania partnership known as Nilon Brothers Enterprises. During the years it operated the concessions at the stadium, it purchased all of its main supplies, including food and beverages, from distributors in Pennsylvania or Georgia. All of its employees were hired through a union hiring hall operated by Philadelphia Local 274 of the Hotel, Restaurant and Bartenders Union. Its authority to sell alcoholic beverages is granted by the Commonwealth of Pennsylvania and the City of Philadelphia, and it is subject to the relevant Pennsylvania *95 and Philadelphia statutes, ordinances and regulations pertaining to its activities.
Although it did supply food and beverage services for various sporting events in New Jersey many years ago, it has not conducted any business of that kind here since the late 1960's. After the completion of thorough discovery pertaining to its New Jersey contacts, the only relationship uncovered consists of the fact that its general liability insurance in 1984 and 1985 was provided by carriers with offices in New Jersey, although its insurance agent was located in Pennsylvania.
As we know, this court's ability to assert personal jurisdiction over the defendant Nilon must comply with the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. R. 4:4-4 is our equivalent of a "long-arm statute" and permits service of process on non-resident defendants "consistent with due process of law." Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971) ("We will allow out-of-state service to the uttermost limits permitted by the United States Constitution.")
If the alleged assault had taken place after the game when the parties had returned to New Jersey, or there had been an automobile accident as a result of Mr. Potash's negligence on the Walt Whitman Bridge just this side of the New Jersey border, Nilon concedes that this court would have jurisdiction. Such a comparable factual situation is found in Young v. Gilbert, 121 N.J. Super. 78 (Law Div. 1972). That case involved a similar dram shop claim against a tavern located approximately seven miles from the New York border and operated by a New York corporation with sparse contacts (including no advertising) in New Jersey. In concluding that jurisdiction was available, Judge Milmed relied upon the Restatement, Conflicts of Law, 2d (1971) § 50. Quoting from the Restatement, the court states, "A state has a natural interest in the effects of an act within its territory even though the act itself was done elsewhere." Young, supra at p. 88. In that case, the automobile accident took place in New Jersey after the defendant, in *96 an intoxicated condition, was returning from a New York tavern.
However, in a recent federal case, the district court concluded that the placement of the tort in Vermont did not defeat jurisdiction in New Jersey. Rutherford v. Sherburne Corporation, 616 F. Supp. 1456 (D.N.J. 1985). Plaintiff was a New Jersey resident who was seriously injured while skiing in Killington, Vermont. As in our case, the ski resort was a foreign corporation which had no assets, employees or agents in New Jersey. However, it was conceded that the defendant advertised its facilities in national and New Jersey publications and engaged in promotions which resulted in a significant percentage of its business coming from New Jersey residents.
In a similar fashion, the Fifth Circuit U.S. Court of Appeals, in construing the Texas long-arm statute, held that a Texas plaintiff could maintain his action in the local district court for redress of a tort committed in New Mexico. Wilkerson v. Fortuna Corp., 554 F.2d 745 (5th Cir.1977). This case involved a claim by a Texas trainer of race horses that the Sunland Park Race Track located just over the border in New Mexico, had arbitrarily breached certain provisions of the regulations of the New Mexico Racing Commission. The New Mexico race track was operated by a New Mexico corporation which had no offices, agents, bank accounts, etc., in the forum state. However, the court found that the race track was located in close proximity to El Paso and that Texas residents were the object of extensive advertising and promotions calculated to lure them to the track. See also Pedelahore v. Astropark, Inc., 745 F.2d 346 (5th Cir.1984), (action maintained by Louisiana residents against Texas amusement park when plaintiff injured on amusement ride in Houston). These cases demonstrate a willingness to disregard the location of the commission of the tort under appropriate circumstances, particularly where defendant has undertaken interstate advertising and promotion.
*97 Although Nilon does not engage in direct advertising and promotion in New Jersey, the Eagles, Phillies and other stadium tenants do. As of yet, the jurisdictional issue as to the defendant Philadelphia Eagles has not been presented to the court (in this case), but the rationale of the federal cases cited above would appear to be favorable to Dr. and Mrs. Maro. The issue, therefore, reduces to this: Is Nilon Bros. subject to the jurisdiction of New Jersey even though it does not directly engage in the multi-state marketing found as a common thread in the Rutherford, Wilkerson and Pedelahore cases, supra? The answer must be yes.
It is obvious that Nilon is an integral part of the sports and entertainment attractions that are aggressively marketed here. Although it may not directly pay for the marketing penetration into New Jersey, Nilon benefits from these efforts jointly with the sports teams and the city (the city provides a modern sports facility with ample parking and easy access from which it derives significant revenues). Theirs is a symbiotic relationship, their separate efforts combining to create desirable recreational activities for residents of the tri-state area and beyond. For instance, a hotdog and cold beer on a sweltering summer evening or a hot chocolate and soft pretzel on a numbing November afternoon are almost as much of the attraction for many spectators as the game itself. Anyone who has taken children to a game knows they are often more interested in the type of ice cream available at the concession stand than the frequently futile endeavors of the Philadelphia home teams. A souvenir program of the annual Army-Navy football game is a "must" for the academies' alumni and the underclassmen (and women) and their families.
It is not insignificant that Nilon has the exclusive right to sell food and beverages within the stadium walls. Although spectators often bring in their own snacks and refreshments, stadium personnel police the import of alcoholic beverages at the gates. As a practical matter, if you want a cold beer during a game *98 you must buy it from the stadium concessionaire  at prices that reflect the city's 35% rake-off from the top.
"Over the years a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other non-residents." McGee v. International Life Ins. Co., 355 U.S. 220, 222, 78 S.Ct. 199, 201, 2 L.Ed.2d 223, 226 (1957). In Burger King Corp. v. Rudzewicz, Justice Brennan restated the need for the jurisdictional due process analysis to be "highly realistic." 471 U.S. 462, 478, 479, 105 S.Ct. 2174, 2185-2186, 85 L.Ed.2d 528. It would be most unrealistic to deny jurisdiction simply because Nilon does not participate directly in the efforts to draw crowds to the stadium. I find that Nilon benefited significantly from continuous and substantial activities which impacted on New Jersey residents during the term of its fifteen year lease and at the time of the commission of the alleged tort here. These efforts create what is commonly known as "general" jurisdiction in the forum state. See the excellent analysis by Judge Cohen in Rutherford, supra, 616 F. Supp. at 1459-1461.
However, the court's jurisdictional reach can still be thwarted if its assertion does not comport with fair play and substantial justice. Burger King, supra. In World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980) the court ruled that a defendant is not subject to jurisdiction unless its contacts are such that it "should reasonably anticipate being haled into court there." Each year of its lease Nilon has sold alcoholic beverages to thousands of New Jersey residents within a few miles of its border, knowing full well the risk of potential tortious behavior, whether committed in Pennsylvania or New Jersey. In recent years, businesses which sell alcoholic beverages have become increasingly concerned about the legal liability resulting from "dram shop" laws. The result obtained here can hardly be unanticipated.
*99 Lastly, in the interest of substantial justice, the availability of a prompt and effective remedy for an injured plaintiff is of concern. It is conceded that a trial date in the appropriate Pennsylvania court may be delayed up to five years while this court's calendar can dispose of a comparable matter in approximately fourteen months. In Charles Gendler & Co. v. Telecom Equipment Corp., 102 N.J. 460, Justice Pollock noted, "A state's interest in providing a forum for its residents is more compelling in a personal injury action than in commercial litigation." at 483. I see no real unfairness in requiring a substantial and sophisticated enterprise such as Nilon to defend in a neighboring state, especially since plaintiffs' counsel acknowledges that Pennsylvania law will apply.
Defendant's motion to dismiss is denied.