689 A.2d 685

TY PAUL STEELE, A SINGLE MAN, PLAINTIFF–RESPONDENT, v. GEORGE KERRIGAN, GREGORY SUTOR, SERENA ULRICH, MICHAEL MCCOOL, AND JOHN DOE, A FICTITIOUS NAME, OPERATORS OF GILHOOLEY'S, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS, AND MUMS, INC., A NEW JERSEY CORPORATION, T/A GILHOOLEY'S, DEFENDANT–APPELLANT.

Argued October 7, 1996—Decided March 6, 1997.

4

*Michael J. Palma* argued the cause for appellant (*Frese & Palma*, attorneys).

*James P. Savio* argued the cause for respondent (*Savio, Reynolds & Drake*, attorneys).

The opinion of the Court was delivered by

STEIN, J.

This appeal provides another opportunity to address the principles that guide apportionment of fault in actions arising under the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, *L.* 1987, *c.* 152 (codified at *N.J.S.A.* 2A:22A–1 to –7) (Licensed Server Liability Act or Act). Plaintiff Steele was assaulted by defendant Kerrigan, an underage patron who was served alcohol by Gilhooley's, a tavern owned by defendant Mums, Inc. (Mums). The central issue concerns the comparison of fault under the Act between the negligent tavern and the assaultive patron. The trial court instructed the jury that once a tavern is found negligent for serving alcohol to an underage patron, the tavern is responsible for the patron's subsequent acts except to the extent that the underage patron's behavior prior to consuming the alcohol contributed to the incident, and the jury apportioned fault accordingly. The Appellate Division affirmed. We reverse and remand for a new trial on liability.

## I

Our summary of the underlying facts is based on the trial record. Shortly after midnight on the evening of November 27, 1992, defendant George Kerrigan, along with his friend George Sutor, entered Gilhooley's, a tavern in Margate. Kerrigan was nineteen years old at the time and Sutor was twenty. Kerrigan testified that he drank five to seven beers at Gilhooley's in the one and one half to two hour period that he was in the tavern. Plaintiff Ty Paul Steele was also at Gilhooley's that morning, accompanied by his friend Robbie Belk. Steele and Belk played a game of pool against Kerrigan and Sutor. Without Kerrigan's knowledge, the other players agreed to bet a round of beers on the game. After Steele and Belk won, Sutor left to buy the beers. Steele approached Kerrigan concerning the bet. Steele and Kerrigan exchanged words. Before long, Kerrigan hit Steele in the face with his fist. According to some testimony, Kerrigan was holding a cue ball in his hand. Kerrigan was six feet tall, weighed 185 pounds and had training as a boxer and weight lifter. Steele's hands were at his sides when he was hit.

Steele sustained serious injuries from the blow, including multiple fractures to his facial bones. He was treated at an emergency room that night and required extensive subsequent surgery that left him with permanent metal plates and screws in his face. Because of his injuries, Steele now suffers from misalignment of his teeth, chronic inflammation and congestion of his sinuses and nasal passages, headaches, earaches, ear ringing, and numbness in his gum and lip.

In January 1993, Steele filed suit against Kerrigan and Mums. Plaintiff also named the shareholders and an employee of Mums, individually, but agreed at trial not to pursue his claims against them. The complaint alleged that Kerrigan intentionally or negligently struck Steele and sought punitive as well as compensatory damages against Kerrigan. The complaint also set forth three theories of liability against Mums: (1) common-law liability based on negligent supervision of the tavern premises; (2) statutory

liability based on service of alcoholic beverages to Kerrigan when the tavern knew or should have known that Kerrigan was a minor [1]; and (3) statutory liability based on service of alcoholic beverages to Kerrigan after Kerrigan was visibly intoxicated. The last claim was dismissed prior to trial on an unopposed motion based on plaintiff's failure to introduce any evidence that Kerrigan appeared intoxicated.

In answer to special interrogatories, the jury found that Kerrigan assaulted Steele and that the assault was a proximate cause of Steele's injuries. The jury also found that Gilhooley's served Kerrigan alcohol, that Gilhooley's knew or should have known that Kerrigan was a minor, that the service of alcohol to Kerrigan proximately caused Steele's injuries, and that Steele's injuries were a foreseeable result of the service of alcohol to Kerrigan. Further, the jury found that Gilhooley's was negligent in supervising the premises and that the negligent supervision was also a proximate cause of the incident. Finally, the jury found that Steele was negligent but that his negligence was not a proximate cause of the incident.

The jury was asked to determine the extent to which each party's tortious conduct contributed to the incident and the resulting injuries. Because Gilhooley's was covered by separate insurance carriers for alcohol-service and for general liability, the verdict form asked for separate fault percentages for the two theories of tavern liability. In instructing the jury on the apportionment of fault between Kerrigan and Mums, the trial court told the jury that, if found negligent in serving Kerrigan, Mums bears full responsibility for Kerrigan's actions after service except to the extent that Kerrigan's entering the bar and requesting that he be served contributed to his inability to appreciate the risk of his behavior after service. That instruction was repeated after the

---

[1] The Licensed Server Liability Act defines "minor" as a person under the legal age to purchase and consume alcoholic beverages. *N.J.S.A.* 2A:22A–3. In this opinion, we use the term in that sense alone.

jury asked for clarification on the law concerning the actions of minors after they are served alcohol. The trial court suggested that the jury consider first the responsibility of Kerrigan and then apportion the remaining responsibility between the two theories of liability asserted against Mums.

The jury found that Kerrigan was 30% at fault, and that the tavern was 50% at fault for negligent service of alcohol to a minor and 20% at fault for negligent supervision of the premises. The jury awarded a total of $275,000 in compensatory damages; it also awarded $7,000 in punitive damages against Kerrigan. The trial court entered judgment against Mums and Kerrigan jointly and severally for $275,000 plus prejudgment interest, and ordered that Mums would have a claim for contribution against Kerrigan for any amount paid exceeding 70%. The court also entered judgment against Kerrigan alone for $7,000. Subsequently, Mums, through its alcohol-service liability carrier, settled the claim for negligent service of alcohol for $137,500. Mums, represented by counsel for the general liability carrier, appealed the verdict on the negligent supervision claim.

The most significant of Mums's grounds for appeal was that based on the jury instruction concerning the apportionment of fault. Mums asserted that the trial court's instruction to the jury regarding the relative fault of Kerrigan and Mums on the statutory alcohol-service claim was flawed because it precluded the jury from attributing any fault to Kerrigan for his conduct after consuming alcohol at Gilhooley's. Mums argued that that instruction misinterpreted the law of alcohol-service liability, and also tainted the jury's apportionment of liability relating to negligent supervision.

In an unpublished opinion, the Appellate Division affirmed the judgment below. Regarding the alleged error in jury instructions, the Appellate Division determined that under the Licensed Server Liability Act, as it applies to service of minors, the "statutory wrong is complete upon service." Therefore, the panel reasoned, to attribute fault to the minor only up to the point of service is

appropriate. The jury having determined that the service was a proximate cause of the injury, the Appellate Division concluded that there was no fundamental unfairness in the jury instructions.

The Appellate Division also affirmed on the other points raised by Mums. Specifically, the Appellate Division found that sufficient evidence existed for the question of liability for negligent supervision to have gone to the jury and to support the jury verdict on that issue; that it was not plain error for the trial court to allow the jury to hear testimony regarding Kerrigan's net worth before the jury decided the liability issues; that it was not harmful error for the trial court to have refused to instruct the jury that the court would award prejudgment interest; and that the trial court was correct to treat the tavern as one entity for purposes of applying the general statutory provisions for joint and several liability and contribution, *see N.J.S.A.* 2A:15–5.3, despite the two distinct theories of recovery against the tavern and the exception from joint and several liability of licensed servers provided by the Licensed Server Liability Act, *see N.J.S.A.* 2A:22A–6.

Mums petitioned this Court for certification on the issue of the jury instruction regarding the apportionment of fault between Kerrigan and Mums and on the issue of the trial court's refusal to instruct on prejudgment interest. We granted certification. 144 *N.J.* 174, 675 *A.*2d 1122 (1996).

## II

### A

We first review the principles governing the apportionment of fault in actions based on assault by one party and negligent supervision of the premises by another. We have held in such cases that the principles of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3, require apportionment of fault between intentional and negligent tortfeasors. *See Blazovic v. Andrich,* 124 *N.J.* 90, 111–12, 590 *A.*2d 222 (1991) (requiring fact-finder to apportion relative percentages of fault for injuries to victim of

parking lot assault between alleged negligent plaintiff, alleged negligent restaurant and alleged intentional tortfeasors); *see also Bonpua v. Fagan,* 253 *N.J.Super.* 475, 479, 602 *A.*2d 287 (App.Div. 1992) (holding that defendant who had been convicted of criminal assault adequately stated an affirmative defense of comparative negligence to civil suit by assault victim); *cf. Bencivenga v. J.J.A.M.M., Inc.,* 258 *N.J.Super.* 399, 406–10, 609 *A.*2d 1299 (App.Div.) (holding that unknown assailant may not be considered when apportioning fault between parties in action based on negligent supervision of premises), *certif. denied,* 130 *N.J.* 598, 617 *A.*2d 1220 (1992). The Comparative Negligence Act, as first adopted in 1973, *L.* 1973, *c.* 146 (codified as amended at *N.J.S.A.* 2A:15–5.1 to 5.3), required the trier of fact to find "[t]he extent, in the form of a percentage, of each party's negligence." *L.* 1973, *c.* 146, § 2b. Subsequent amendments maintained this language, which referred to "negligence" only. *See L.* 1987, *c.* 325, § 1. The Court, however, "read the term 'negligence' in the Act 'as being subsumed within the concept of tortious fault.'" *Blazovic, supra,* at 103, 590 *A.*2d 222 (quoting *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 162, 406 *A.*2d 140 (1979) (holding Comparative Negligence Act applicable to apportion fault in strict-liability claim)). Accordingly, the Court held, in an action alleging assault against one defendant and negligent supervision of the premises against another, that "responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault, including the fault attributable to an intentional tortfeasor." *Blazovic, supra,* 124 *N.J.* at 107, 590 *A.*2d 222.[2]

---

[2] The 1995 amendments to the Comparative Negligence Act inserted the language "negligence or fault," clarifying that the fact-finder must apportion all fault attributable to each party. *See L.* 1995, *c.* 140, § 1 (codified at *N.J.S.A.* 2A:15–5.2). The amended statute now provides that the fact-finder must determine:

> a. The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence or fault, that is, the full value of the injured party's damages;

In *Blazovic, supra*, the Court acknowledged but declined to follow case law from other jurisdictions holding that comparative negligence principles should not be applied to actions involving intentional and negligent tortfeasors; the Court noted that those cases were generally decided under contributory negligence regimes and were therefore aimed at circumventing the harsh effects of a complete bar to recovery. *See* 124 *N.J.* at 101, 106, 590 *A.*2d 222 (citing *Steinmetz v. Kelly*, 72 *Ind.* 442, 446 (1880); Prosser, *Comparative Negligence*, 41 *Cal. L.Rev.* 1, 4–7 (1953)). The *Blazovic* Court noted that the Comparative Negligence Act replaced the absolute bar of common-law contributory negligence with a comparative fault system, *id.* at 97, 590 *A.*2d 222; *see* *N.J.S.A.* 2A:15–5.1; *Ostrowski v. Azzara*, 111 *N.J.* 429, 436, 545 *A.*2d 148 (1988), and observed that "[r]efusal to compare the negligence of a plaintiff whose percentage of fault is no more than fifty percent with the fault of intentional tortfeasors is difficult to justify under a comparative-fault system in which that plaintiff's recovery can be only diminished, not barred," 124 *N.J.* at 106, 590 *A.*2d 222 (citing Dear & Zipperstein, *Comparative Fault and Intentional Torts: Doctrinal Barriers and Policy Considerations*, 24 *Santa Clara L.Rev.* 1, 11 (1984)). The *Blazovic* Court also rejected "the concept that intentional conduct is 'different in kind' from both negligence and wanton and willful conduct, and consequently cannot be compared with them." *Id.* at 107, 590 *A.*2d 222. Instead, the Court interpreted the different types of conduct to be "different in degree," and stated that the difference does not preclude comparison by a jury in accordance with the basic principles of comparative fault:

> The different levels of culpability inherent in each type of conduct will merely be reflected in the jury's apportionment of fault. By viewing the various types of tortious conduct in that way, we adhere most closely to the guiding principle of

b. The extent, in the form of a percentage, of each party's negligence or fault. The percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%.

comparative fault—to distribute the loss in proportion to the respective faults of the parties causing that loss.

[*Ibid.*]

In *Blazovic*, the Court also noted that the application of comparative negligence principles to the apportionment of fault between intentional and negligent tortfeasors conforms with developments in the law governing contribution between joint tortfeasors and the law governing credit given nonsettling tortfeasors for partial settlements by other tortfeasors. *See id.* at 103–06, 590 A.2d 222. In *Judson v. Peoples Bank & Trust Co.*, 17 *N.J.* 67, 87–91, 110 A.2d 24 (1954), the Court interpreted the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1 to –20, as abrogating the common-law rule that contribution is not allowed between joint intentional tortfeasors; subsequent cases extended *Judson* to permit contribution between joint tortfeasors when one was liable on a negligence theory and the other on a strict liability theory. *See Blazovic, supra,* 124 *N.J.* at 104–05, 590 A.2d 222 (citing *Cartel Capital Corp. v. Fireco*, 81 *N.J.* 548, 410 A.2d 674 (1980); *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 32 *N.J.* 55, 159 A.2d 97 (1960); *Neveroski v. Blair*, 141 *N.J.Super.* 365, 358 A.2d 473 (App.Div.1976)). The Comparative Negligence Act modified the Joint Tortfeasors Contribution Law to require that contribution be determined by percentage of fault assigned by the trier of fact, rather than on a *pro rata* basis. *See id.* at 105, 590 A.2d 222 (citing *N.J.S.A.* 2A:15–5.3; *Cartel Capital Corp., supra,* 81 *N.J.* at 569, 410 A.2d 674; *Lee's Hawaiian Islanders, Inc. v. Safety First Prods.*, 195 *N.J.Super.* 493, 505, 480 A.2d 927 (App.Div.), *certif. denied*, 99 *N.J.* 205, 491 A.2d 703 (1984)). Similarly, the Comparative Negligence Act also modified the rule governing the credit due a nonsettling tortfeasor for a settling tortfeasor's share of the judgment to require apportionment by percentage of fault. *See id.* at 106, 590 A.2d 222 (citing *Young v. Latta*, 233 *N.J.Super.* 520, 559 A.2d 465 (App.Div.), *aff'd*, 123 *N.J.* 584, 589 A.2d 1020 (1991)). Therefore, when joint tortfeasors are liable based on different tort theories, it is now necessary to apportion fault between them in

order to determine their rights of contribution or rights to credit for partial settlements.

The *Blazovic* Court reasoned that assessing damages in proportion to fault in the circumstances presented by that case did not undermine the Court's holding in *Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 445 *A.*2d 1141 (1982), which imposed liability on a commercial-property owner for negligently failing to prevent a criminal assault on a patron in a parking lot. *See Blazovic, supra,* 124 *N.J.* at 110, 590 *A.*2d 222. The Court recognized a line of decisions that might be interpreted to "preclude apportionment of fault between two tortfeasors when the duty of one encompassed the obligation to prevent the specific misconduct of the other," including *Cowan v. Doering,* 111 *N.J.* 451, 466–67, 545 *A.*2d 159 (1988) (holding contributory negligence not available to hospital as defense against psychiatric patient who jumped out of window), *Suter, supra,* 81 *N.J.* at 177, 406 *A.*2d 140 (holding comparative negligence not available to manufacturer as defense in products-liability case where plaintiff was injured by using product for its intended or foreseeable purpose), and *Soronen v. Olde Milford Inn, Inc.,* 46 *N.J.* 582, 592, 218 *A.*2d 630 (1966) (holding contributory negligence not available as defense to tavern that negligently sells alcoholic beverages to already intoxicated patron). *Blazovic, supra,* 124 *N.J.* at 111, 590 *A.*2d 222. However, the *Blazovic* Court held that the rationale of those cases was inapplicable:

> Based on the record before us, it would be highly speculative to conclude that the causal connection between Plantation's alleged negligence and the combined misconduct of plaintiff and the individual defendants was sufficient to invoke the rationale of *Cowan, Suter,* and *Soronen.* Our view is that the events that allegedly took place in the parking lot neither were sufficiently foreseeable nor bore an adequate causal relationship to Plantation's alleged fault to justify the imposition on Plantation of the entire responsibility for the resultant injury.
>
> [*Id.* at 112, 590 *A.*2d 222.]

Thus, although a defendant may have a duty to prevent injury to a plaintiff directly attributable to a third party assault, in such negligence actions foreseeability and causation often require fact-intensive inquiries. Therefore, the jury ordinarily should appor-

tion fault between the negligent supervisor and the intentional tortfeasor based on the circumstances of the specific case.

B

We also review the principles governing apportionment of fault in alcohol-service-liability litigation. The Licensed Server Liability Act specifies that the Comparative Negligence Act "shall apply in all civil actions instituted pursuant to the provisions of this act." *N.J.S.A.* 2A:22A–6. The Licensed Server Liability Act is a codification of the common-law "dram shop" doctrine that evolved in a series of cases beginning with *Rappaport v. Nichols,* 31 *N.J.* 188, 156 *A.*2d 1 (1959). (For a comprehensive history of civil dram-shop liability in New Jersey, see *Lee v. Kiku Restaurant,* 127 *N.J.* 170, 175–79, 603 *A.*2d 503 (1992) and *Buckley v. Estate of Pirolo,* 101 *N.J.* 68, 74–79, 500 *A.*2d 703 (1985)). By enacting the Act, the Legislature intended to address "drastic increases" in the cost of insuring for dram-shop liability by defining the limits of such liability. *N.J.S.A.* 2A:22A–2; *see Fisch v. Bellshot,* 135 *N.J.* 374, 382, 640 *A.*2d 801 (1994). The Act was "designed to protect the rights of persons who suffer loss as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server while at the same time providing a balanced and reasonable procedure for allocating responsibility for such losses." *N.J.S.A.* 2A:22A–2. Thus, the Legislature required that comparative negligence principles be applied to apportion fault.

Although the Licensed Server Liability Act provides that the Comparative Negligence Act governs, the Act does not specify detailed principles to guide the apportionment of fault in such cases. We have therefore looked for guidance to the historical application of contributory negligence and comparative negligence principles to actions brought under this State's common-law dram-shop doctrine. The early dram-shop cases were decided before the adoption of the Comparative Negligence Act in 1973, *L.* 1973, *c.* 146, which largely abrogated the common-law doctrine of contributory negligence. *See N.J.S.A.* 2A:15–5.1. In those early

cases, the Court was reluctant to allow the defense of contributory negligence, which would have completely barred recovery from a tavern that was determined to be negligent on a dram-shop theory if the plaintiff was determined to be contributorily negligent. In *Soronen v. Olde Milford Inn, supra,* the widow of a tavern patron, who died from injuries suffered when he fell and struck his head on a steel column, sued the tavern for wrongful death, alleging that the tavern had continued to serve her husband after he became severely intoxicated. 46 *N.J.* at 584–85, 218 *A.*2d 630. The tavern sought to defend based on the contributory negligence of the patron. *Id.* at 585, 218 *A.*2d 630. The Court held that the defense of contributory negligence was not available, stating:

> The accountability [of the tavern for service to a patron who is visibly intoxicated] may not be diluted by the fault of the patron for that would tend to nullify the very aid being afforded. Since the patron has become a danger to himself and is in no position to exercise self-protective care, it is right and proper that the law view the responsibility as that of the tavern keeper alone.
>
> [*Id.* at 592, 218 *A.*2d 630.]

The Court subsequently relied on the same principle to bar the defense of contributory negligence in a dram-shop action brought by an injured third party. In *Aliulis v. Tunnel Hill Corp.,* 59 *N.J.* 508, 284 *A.*2d 180 (1971), the plaintiff, a sixteen-year-old passenger injured in the crash of an automobile caused by the intoxicated driver, sought recovery from one of the taverns that had served the underage driver. *Id.* at 509, 284 *A.*2d 180. The tavern defended based on the theory that the passenger was contributorily negligent for deciding to ride with the intoxicated driver—the same defense that would have been available to the driver if she had been sued. *Id.* at 510, 284 *A.*2d 180. The Court held that the defense of contributory negligence was not available to the tavern in this circumstance, where the plaintiff, who was sixteen years old and in a strange town at 3:00 a.m., had no real choice but to ride in the intoxicated driver's car. *Id.* at 511, 284 *A.*2d 180. The Court specifically stated, however, that contributory negligence might be available as a defense against third-party claimants who were negligent in other ways. For example, contributory negligence might be an available defense in a case where

a driver's own negligence contributed to a collision with a car driven by an intoxicated tavern patron. *Ibid.*

In its first consideration of the application of the Comparative Negligence Act to a dram-shop action, the Court applied similar principles to balance the duty of the tavern to refrain from serving intoxicated patrons with the duty of the patron to take self-protective measures. In *Buckley v. Estate of Pirolo, supra,* the plaintiffs were the survivors of three passengers killed in the crash of an airplane being used for recreational purposes. 101 *N.J.* at 71–72, 500 *A.*2d 703. The plaintiffs sued the establishment in which the pilot and two of the passengers had been drinking, alleging that the establishment had continued to serve the pilot after he became visibly intoxicated. *Ibid.* The establishment alleged comparative negligence on the part of the passengers based on each passenger's decision to ride with the intoxicated pilot. *Id.* at 72, 500 *A.*2d 703. The Appellate Division, assuming that the passengers were not intoxicated, had held that the establishment could claim the benefit of the Comparative Negligence Act to reduce recovery by the passengers' survivors. 190 *N.J.Super.* 491, 500, 464 *A.*2d 1136 (App.Div.1983). The Appellate Division had reasoned that that result did not undermine the policy of the dram-shop doctrine to protect "the intoxicated patron from his incapacity to protect himself or the public from foreseeable and unreasonable risk of harm," because the passengers were capable of self-protection. *Id.* at 498, 464 *A.*2d 1136.

This Court generally approved of the Appellate Division's legal analysis. Nevertheless, the Court reversed and remanded because it found that the record was inadequate concerning the intoxication of the passengers. 101 *N.J.* at 77–81, 500 *A.*2d 703. The Court held that on remand the plaintiffs would be free to meet the comparative negligence defense by "contend[ing] that their decedents did not act unreasonably in going on the ill-fated flight, probably on some theory of their non-appreciation of any unreasonable risk" and that to that end plaintiffs could present evidence that the passengers were themselves intoxicated by

consumption of alcohol at the establishment. *Id.* at 80–81, 500 A.2d 703. Thus, the Court endorsed an approach to comparative fault in dram-shop actions that asked the fact-finder to assess the ability of the intoxicated patron to appreciate the consequences of her own actions in apportioning fault between the tavern and its patrons. Justice O'Hern's concurrence, however, suggested that the legislative abrogation of the doctrine of contributory negligence in favor of a comparative negligence system warranted a fuller reexamination of the appropriate apportionment of fault in dram-shop actions. *Id.* at 82–83, 500 A.2d 703 (O'Hern, J., concurring).

In *Lee v. Kiku Restaurant, supra,* the Court undertook that reexamination and further refined the principles for apportioning fault between taverns and intoxicated patrons. The plaintiff in *Lee* was injured in an automobile accident; he was a passenger accompanying the intoxicated driver who was at fault. 127 *N.J.* at 172, 603 A.2d 503. The passenger sued the restaurant at which he and the driver had been drinking prior to the accident, alleging that the restaurant served the driver after he became visibly intoxicated. *Id.* at 173, 603 A.2d 503. The issue on appeal was how the jury should be instructed regarding the comparison of the conduct of the driver and the passenger with the restaurant's actions in serving them. *Id.* at 174–75, 603 A.2d 503. The Court modified the holding in *Buckley* as it applied to most cases where the patron was served after reaching the point of intoxication, by shifting the focus of the jury's inquiry away from the negligent patron's ability to appreciate the consequences of his actions after the negligent service of alcohol by the tavern, focusing instead on the extent to which the patron's drinking up to the point of intoxication contributed to his presumed later inability to appreciate the consequences of his actions. The Court held:

> First, an intoxicated patron may no longer avoid responsibility for injuries proximately caused by his or her voluntary decision to consume alcohol to the point of intoxication. Second, once a jury determines that a tavern continued to serve drinks to a visibly-intoxicated patron, the jury should not be instructed, absent *exceptional circumstances,* to determine the extent to which the patron retained some capacity to appreciate the risk of engaging in the activity that led to the

accident. If the tavern serves alcohol to a visibly-intoxicated patron, a court will ordinarily presume the patron's lack of capacity to evaluate the ensuing risks.

[*Id.* at 184, 603 *A.*2d 503.]

Thus, the *Lee* Court "struck a balance between the unfairness of the *Soronen* rule ... and the confusion surrounding the application of the *Buckley* factor, *i.e.*, the plaintiff's ability to appreciate the risk of engaging in the activity that led to the accident." *Fisch, supra,* 135 *N.J.* at 388, 640 *A.*2d 801.

The *Lee* holding does not impose strict liability for all injuries caused by a tavern patron after negligent service by a tavern. The presumption established in *Lee*—that if a tavern negligently served a patron after the patron reached the point of intoxication, the patron thereafter ordinarily will have lacked the capacity to appreciate the risks of her subsequent actions that led to the injuries at issue—is to be used in apportioning fault between a tavern and a patron only for that part of the injuries attributable to the patron's negligence caused by intoxication. In order to complete the apportionment of fault, the fact-finder must consider all of the causes of the incident. As stated in *Lee:*

[T]he jury may allocate the fault involved in the negligent operation of the vehicle between the patron-driver and the tavern based on the jury's qualitative evaluation of all of the evidence bearing on the extent to which the respective conduct of the patron-driver and the tavern contributed to the negligent operation of the vehicle. In making that allocation, the jury may consider the patron-driver's conduct in becoming voluntarily intoxicated, the extent of the tavern's misconduct in continuing to serve the patron-driver, and the specific evidence relating only to the nature and circumstances of the negligent operation of the vehicle. Juries must be informed that they are authorized to allocate responsibility for negligent operation of a vehicle between the patron-driver and the tavern based on the relevant evidence.

[*Lee, supra,* 127 *N.J.* at 185–86, 603 *A.*2d 503.]

Just as under the proximate cause inquiry required by the Licensed Server Liability Act, *N.J.S.A.* 2A:22A–5, the jury is free to find that the negligent alcohol service was not a proximate cause of the injury at all, the jury is also free to apportion all fault to the patron for any of the patron's actions that were not the result of intoxication. For example, a driver who for some time has knowingly been driving an automobile with faulty brakes can not

shift to the tavern responsibility for driving the automobile in that condition on the occasion in question simply because the tavern was negligent in serving the driver after she was visibly intoxicated, even if other aspects of the driver's negligence contributing to the accident were due to intoxication. *Cf. Thompson v. Victor's Liquor Store, Inc.*, 216 *N.J.Super.* 202, 212, 523 *A*.2d 269 (App.Div. 1987) ("[I]f adequate proof supports such a finding, a jury could determine that plaintiff drove negligently and would have driven in the same manner ... whether he was inebriated or not.").

Although the incident at issue in *Lee* arose before the enactment of the Licensed Server Liability Act in 1987, *L*. 1987, *c*. 152, the Court stated that apportionment of fault to the patron for drinking to the point of intoxication was consistent with the Act. *Lee, supra,* 127 *N.J.* at 183, 603 *A*.2d 503. As noted above, the Licensed Server Liability Act specifically calls for the application of the Comparative Negligence Act. *See N.J.S.A.* 2A:22A–6. In *Fisch v. Bellshot,* the Court's first opportunity to consider the application of the Comparative Negligence Act to a case arising under the Licensed Server Liability Act, the Court approved of the *Lee* Court's conclusion "that the principles set forth [in *Lee*] are completely 'consistent with the apparent intent of the Legislature in enacting the Act.' " *Fisch, supra,* 135 *N.J.* at 388, 640 *A*.2d 801 (quoting *Lee, supra,* 127 *N.J.* at 183, 603 *A*.2d 503).

In *Fisch, supra,* the Court also had its first opportunity to address the scope of *Lee. Fisch* involved a bartender who served herself alcoholic beverages while on duty and later died in a one-car accident as she attempted to drive home. 135 *N.J.* at 378, 640 *A*.2d 801. The bartender's survivors sued the tavern at which she worked. *Ibid.* The trial court instructed the jury according to *Buckley,* telling the jury it could find the bartender negligent for deciding to drive "if she retained some ability to appreciate the risk of driving in an intoxicated state." *Id.* at 389, 640 *A*.2d 801. The plaintiff argued on appeal that the trial court instead should have instructed the jury according to *Lee,* that is, it should have told the jury that, if the jury determined that the tavern served

the bartender after she became visibly intoxicated, it should not consider the bartender's negligence in subsequently deciding to drive. *Ibid.* Emphasizing that the decedent had served herself despite her obligation not to do so while on duty and that, based on her occupational training and experience, she was equipped "with an increased ability to assess the progression of intoxication and to understand the debilitating effect of excessive drinking," the Court held that this was a case of "exceptional circumstances" in which the *Lee* presumption was inappropriate and therefore the *Buckley* instruction was correct. *Id.* at 390–91, 640 *A.*2d 801. *Lee, supra,* had anticipated that such "exceptional circumstances" might exist. 127 *N.J.* at 184, 603 *A.*2d 503. The *Fisch* Court confirmed, however, that *Lee* provided the general rule to be followed in apportioning fault between a tavern and a patron for the patron's negligent actions subsequent to the tavern's negligent service of alcohol to the patron. *See Fisch, supra,* 135 *N.J.* at 390–91, 640 *A.*2d 801.

We note that we infer from the provisions of the Licensed Servers Liability Act a legislative recognition that innocent plaintiffs injured in part as a result of negligent service by a licensed server may not always receive full compensation for their injuries. In addition to specifying the application of the Comparative Negligence Act, the Licensed Server Liability Act further limits servers' exposure by providing that a server is never responsible for a greater share of the damages than the percentage of fault attributed to it, notwithstanding contrary provisions of the Comparative Negligence Act calling for limited joint and several liability between multiple tortfeasors. *See N.J.S.A.* 2A:22A–6b.[3]

---

[3] Prior to 1987, the Comparative Negligence Act provided for joint and several liability for all damages. *L.* 1973, *c.* 146, § 3. The 1987 amendments, which were under consideration at the time that the Licensed Servers Liability Act was adopted, imposed joint and several liability for economic damages only on tortfeasors found to be more than 20% at fault and for noneconomic damages only on tortfeasors found to be more than 60% at fault. *L.* 1987, *c.* 325. The Comparative Negligence Act was amended again by *L.* 1995, *c.* 140. Under the newly amended statute, a party determined to be 60% or more responsible for

Thus it is clear that the Legislature intended that comparative negligence principles be used to apportion fault between multiple defendants as well as between plaintiff and defendant, and that recovery from the tavern be limited to the percentage apportioned, notwithstanding the fact that a blameless plaintiff may be unable to recover fully in cases where one or more tortfeasors are insolvent. *Cf. N.J.S.A.* 2A:15–5.8 (providing same protection from joint and several liability to social hosts as provided to licensed servers and thus superseding holding in *Kelly v. Gwinnell,* 96 *N.J.* 538, 559, 476 *A.*2d 1219 (1984), that social hosts found negligent for serving intoxicated guests are to be held jointly liable with their guests for injuries to third parties).

## C

 This appeal differs from previous cases in which this Court has considered the principles of comparative negligence as applied to dram-shop actions, in that the injury was the direct consequence of an assault rather than of negligent driving. The Licensed Server Liability Act itself does not distinguish between damages caused by intentional torts and damages caused by negligent acts. Rather, once a licensed server is found to have been negligent, the damages for which it is liable are limited only by issues of causation and foreseeability. As stated in the Act:

A person who sustains personal injury or property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover damages from a licensed alcoholic beverage server only if:

(1) The server is deemed negligent pursuant to subsection b. of this section; and

(2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and

(3) The injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.

[*N.J.S.A.* 2A:22A–5a.]

---

the total damages remains jointly and severally liable for the entire award, but a party less than 60% responsible is liable only for damages directly attributable to that party's negligence or fault, whether the damages are economic or non-economic. *N.J.S.A.* 2A:15–5.3.

Similarly, prior to the adoption of the Licensed Server Liability Act, the determination of whether a patron's actions were such that the negligent tavern could be held liable for them followed the basic outlines of negligence law, that is, the tavern must have been found to have breached an existing duty, and that breach must have proximately caused the injury. *See Finney v. Ren–Bar, Inc.*, 229 *N.J.Super.* 295, 301, 551 *A.*2d 535 (App.Div.1988) (holding tavern liable for damages caused by minor patron who negligently caused fire after returning home from tavern). Duty traditionally has been defined by the foreseeability of the particular harm to be guarded against. *See Hill v. Yaskin*, 75 *N.J.* 139, 144, 380 *A.*2d 1107 (1977). Of course, the duty inquiry involves questions of policy as well as logical foreseeability. *See Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 75, 222 *A.*2d 513 (1966). "[W]hether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Kelly, supra*, 96 *N.J.* at 544, 476 *A.*2d 1219 (quoting *Goldberg v. Housing Auth.*, 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962) (emphasis omitted), and holding that social hosts have duty to prevent drunken driving accidents by refraining from serving intoxicated guests).

The duty of a tavern to refrain from negligently serving patrons, both before and after adoption of the Licensed Server Liability Act, has most often been recognized in the context of preventing automobile accidents. Such cases include *Fisch, supra; Lee, supra; Buckley, supra; Kelly, supra; Aliulis, supra; Rappaport, supra; Petitto v. Sands Hotel & Casino*, 288 *N.J.Super.* 304, 672 *A.*2d 253 (App.Div.), *certif. denied*, 144 *N.J.* 589, 677 *A.*2d 761 (1996); *Benson v. Brown*, 276 *N.J.Super.* 553, 648 *A.*2d 499 (App.Div.1994); and *Geherty v. Moore*, 238 *N.J.Super.* 463, 570 *A.*2d 29 (App.Div.1990). In common-law cases involving taverns that serve intoxicated or minor patrons the policy discussion has generally focused on drunken driving. For example, *Rappaport, supra*, noted that the foreseeability of unreasonable risk of harm to the public when alcoholic beverages are sold to a minor or intoxicated person is "particularly evident in current times when

traveling by car to and from the tavern is so commonplace and accidents resulting from drinking are so frequent." 31 *N.J.* at 202, 156 *A.2d* 1. The *Rappaport* Court cited several scholarly studies concerning automobile accidents. *See ibid.* Similarly, the legislative history of the Licensed Server Liability Act shows that the Legislature was largely concerned with liability for injuries caused by automobile accidents. *See, e.g.,* Assembly Insurance Committee, *Statement to Assembly Committee Substitute for A. 2264, 2209, 2211, 1876, 1679, 864, and 554* at 2 (May 29, 1986) ("[L]icensed alcoholic beverage servers are often named in personal injury suits which are filed in connection with automobile accidents involving drunken driving."). The foreseeability to taverns of automotive accidents being caused by intoxicated drivers is indisputable.

In the context of social host liability, New Jersey treats the negligent operation of an automobile as a special risk of intoxication, different from all other intoxicated acts. Specifically, the 1988 amendments to the Comparative Negligence Act provide that social hosts will be liable for damages to third parties caused by adult guests whom the host negligently served when visibly intoxicated only when those damages were caused by the negligent operation of an automobile. *See N.J.S.A.* 2A:15–5.6; *Componile v. Maybee,* 273 *N.J.Super.* 402, 404–09, 641 *A.2d* 1143 (Law Div. 1994). The first reported case to extend "dram shop" type liability to social hosts, *Linn v. Rand,* 140 *N.J.Super.* 212, 356 *A.2d* 15 (App.Div.1976), involved an intoxicated minor driver, *id.* at 214, 356 *A.2d* 15. The court noted that the foreseeability of accident or injury in those circumstances was "devastatingly apparent in view of the ever-increasing incidence of serious automobile accidents resulting from drunken driving." *Id.* at 219, 356 *A.2d* 15. In *Kelly v. Gwinnell, supra,* which first announced the duty of social hosts to third parties injured by intoxicated adult guests, the Court specifically limited its holding to cases involving automobile accidents. *See* 96 *N.J.* at 559, 476 *A.2d* 1219. In *Griesenbeck by Kuttner v. Walker,* 199 *N.J.Super.* 132, 488 *A.2d*

1038 (App.Div.), *certif. denied,* 101 *N.J.* 264, 501 *A.*2d 932 (1985), the Appellate Division declined to extend social host liability to cover the negligent setting of a fire by an intoxicated adult. *See id.* at 134, 488 *A.*2d 1038. The Appellate Division based the distinction between automobile accidents and other types of injuries on foreseeability and fairness, writing:

> In imposing [a duty to not serve intoxicated guests who will drive] upon a social host [in *Kelly*], the court recognized the reasonable foreseeability of the harm to others likely to result from the operation of a car by the intoxicated guest and the fairness of holding the host responsible for injuries resulting from the presence on the highway of a drunken driver whose intoxicated condition was due in large measure to the conduct of the host. This result was also deemed to be consistent with desired social goals. As the present case does not involve the operation of a motor vehicle by the intoxicated guest, these applications of foreseeability and fairness are not pertinent to our consideration of the existence of a duty....
>
> [*Id.* at 138, 488 *A.*2d 1038.]

The liability of social hosts in New Jersey for injuries caused by their intoxicated guests has never been extended beyond injuries in automobile accidents.

■ The duty imposed on a tavern, on the other hand, has never been limited to preventing automobile accidents. *See, e.g., Soronen, supra,* 46 *N.J.* at 587, 218 *A.*2d 630 (implicitly assuming tavern may be liable on dram-shop cause of action for injury sustained by tavern patron in drunken fall). In *Finney,* a tavern was held liable for injuries caused by a minor patron who negligently set a fire after returning home from the tavern, despite *Griesenbeck* 's holding that social hosts could not be held liable in a similar fact pattern. *Finney, supra,* 229 *N.J.Super.* at 300–04, 551 *A.*2d 535. The Appellate Division agreed with the trial court that "to a tavern serving liquor to an underage person, it was reasonably foreseeable that some injury would result, and that this injury was neither a bizarre nor attenuated result of the tavern's conduct." *Id.* at 300, 551 *A.*2d 535. The broader duty of a tavern as opposed to a social host reflects both the more complete knowledge imputed to the tavern and the higher standard of care imposed as a policy matter on licensed servers, both legislatively and by the courts. *See id.* at 304, 551 *A.*2d 535; *see also Kelly, supra,* 96 *N.J.* at 565–67, 476 *A.*2d 1219 (Garibaldi, J., dissenting)

(comparing taverns' expertise about and control over patron intoxication with lesser expertise and control of social hosts who serve alcohol to guests).

Without question, the occasional assault by a belligerent drunk is a foreseeable consequence of serving alcohol. A tavern therefore may have a duty to prevent such assaults by refraining from negligent service. A nineteenth century New Hampshire court put it colorfully when it described alcohol as "a stimulus highly promotive of brawls, affrays, riots and all other crimes," and asked "why one held liable for damage done by dangerous animals belonging to, or kept by, himself, or carelessly conducted by him into a populous town, should not also be liable for damage done by men whom he has drawn together in the same place, and aided in making irrational, uncontrollable, and dangerous...." *Underhill v. City of Manchester*, 45 *N.H.* 214, 216–18 (1864). Although no New Jersey court has directly ruled on the question of whether a tavern is liable on a dram-shop cause of action for an assault by an intoxicated patron, courts have assumed implicitly that that type of liability exists. *See, e.g., Popow v. Wink Assocs.*, 269 *N.J.Super.* 518, 527–29, 636 *A.2d* 74 (App.Div.1993) (holding that tavern found liable under negligent supervision claim for injuries caused by assault of one patron on another could not appeal jury verdict that found no alcohol-service liability in order to bring liability under tavern's alcohol-service liability insurance coverage); *Maro v. Potash*, 220 *N.J.Super.* 90, 97–99, 531 *A.2d* 407 (Law Div.1987) (taking personal jurisdiction over concessionaire at Veterans' Stadium in Pennsylvania in dram-shop action brought by spectator who was New Jersey resident for damages caused by assault by intoxicated fellow spectator at football game); *Mt. Hope Inn v. Travelers Indem. Co.*, 157 *N.J.Super.* 431, 438, 384 *A.2d* 1159 (Law Div.1978) (holding that insurer had no duty to defend tavern with respect to allegations that tavern negligently served intoxicated patron who assaulted another patron where insurance policy contained exclusion for dram-shop liability). Other jurisdictions that have dram-shop statutes frequently recognize

that taverns may be liable for injuries caused by assaults by patrons as well as by patrons' negligent acts. *See* 45 *Am.Jur.2d Intoxicating Liquors,* § 567 (1969).

The parties to this action do not dispute that such liability may be imposed pursuant to the Licensed Server Liability Act. Neither do they dispute that in such actions fault may be apportioned between negligent and intentional tortfeasors. As stated in *Blazovic, supra,* "the divergence between intentional conduct and negligence [does not preclude] comparison by a jury." 124 *N.J.* at 107, 590 *A.*2d 222. The practical guidelines appropriate to the apportionment of fault in an alcohol-service liability action involving an alleged assault, however, may differ from the guidelines appropriate to the apportionment of fault in the alcohol-service liability cases we have previously considered.

## D

Finally, we have also considered the fact that the tavern's alcohol-service liability in this appeal was based on negligent service to a minor as opposed to negligent service to an intoxicated adult. The Licensed Server Liability Act provides that for purposes of determining liability a server of alcoholic beverages may be deemed negligent in two circumstances: "when the server served a visibly intoxicated person, or served a minor, under circumstances where the server knew, or reasonably should have known, that the person served was a minor." *N.J.S.A.* 2A:22A-5b. As noted above, a "minor" is defined by the Act as "a person under the legal age to purchase and consume alcoholic beverages." *N.J.S.A.* 2A:22A-3. Previous to the adoption of the Licensed Server Liability Act, common-law dram-shop liability similarly encompassed service both to a visibly intoxicated patron and to an underage patron. *See Rappaport, supra,* 31 *N.J.* at 201, 156 *A.*2d 1 ("Where a tavern keeper sells alcoholic beverages to a person who is visibly intoxicated or to a person he knows or should know from the circumstances to be a minor, he ought to recognize and foresee the unreasonable risk of harm to others through action of

the intoxicated person or the minor."). In reaching this result, the case law relied in part on administrative regulations that prohibited liquor licensees from serving minors or visibly intoxicated patrons. *See id.* at 202, 156 *A.*2d 1; *Thompson, supra,* 216 *N.J.Super.* at 205 n. 3, 523 *A.*2d 269.

The imposition of liability on a tavern that serves a minor, whether or not that minor can be shown to have been intoxicated at the time, reflects the recognition that minors are especially likely to be adversely affected by alcohol and to cause damage to themselves and others. In *Rappaport, supra,* the Court emphasized the "special susceptibilities" of underage drinkers:

The Legislature has in explicit terms prohibited sales to minors as a class because it recognizes their very special susceptibilities and the intensification of the otherwise inherent dangers when persons lacking in maturity and responsibility partake of alcoholic beverages; insofar as minors are concerned the sale of the first drink which does "its share of the work" and which generally leads to the others is unequivocally forbidden.

[31 *N.J.* at 201, 156 *A.*2d 1 (citing *Taylor v. Wright,* 126 *Pa.* 617, 17 *A.* 677, 678 (1889)).]

Other jurisdictions have analogized the furnishing of alcohol to giving a firearm, gunpowder or even an automobile to a minor. *See Estate of Hernandez v. Arizona Bd. of Regents,* 177 *Ariz.* 244, 866 *P.*2d 1330, 1340–41 (1994) (automobile); *Davis v. Shiappacossee,* 155 *So.*2d 365, 367 (Fla.1963) (firearm); *Tobin v. Norwood Country Club, Inc.,* 422 *Mass.* 126, 661 *N.E.*2d 627, 633 (1996) (gunpowder). "Once a vendor places liquor in the hands of a minor, it may set in motion the very harm which the Legislature has attempted to prevent." *Michnik–Zilberman v. Gordon's Liquor, Inc.,* 390 *Mass.* 6, 453 *N.E.*2d 430, 433 (1983) (holding vendor liable for injuries to third party caused by negligent sale of alcohol to underage drinker).

In general, New Jersey's policy against serving minors enjoys even stronger legislative support than the policy against serving intoxicated adults. *Rappaport* relied in part on the Legislature's decision to create a disorderly person offense for selling alcoholic beverages to a minor. *See Rappaport, supra,* 31 *N.J.* at 201, 156 *A.*2d 1 (citing *N.J.S.A.* 33:1–77). Minors themselves commit a

disorderly persons offense when they buy liquor. *N.J.S.A.* 33:1–81; *see also N.J.S.A.* 9:17B–1b (establishing minimum legal drinking age). There is no counterpart statute governing sales to visibly intoxicated persons. In recent legislation limiting the liability of social hosts for damages caused by guests who were served after they became visibly intoxicated to injuries to third parties in automobile accidents, the Legislature specifically preserved full common-law liability of social hosts for damages caused by minors to others and even to themselves. *See N.J.S.A.* 2A:15–5.6 to 5.7; *see also Kelly, supra,* 96 *N.J.* at 561 n. 1, 476 *A.*2d 1219 (Garibaldi, J., dissenting) (noting that author, although dissenting on extension of liability to social hosts for damages to third parties caused by serving alcohol to visibly intoxicated guests, would vote to uphold extension of liability to social hosts who serve minors).

In New Jersey's common law, "[t]he liability of a person controlling alcohol and serving it to minors has historically preceded and even exceeded that respecting service of alcohol to adults." *Finney, supra,* 229 *N.J.Super.* at 301, 551 *A.*2d 535. The seminal case establishing a dram-shop cause of action, *Rappaport, supra,* was based on service of alcoholic beverages to a minor who later caused an automobile accident in which plaintiff's decedent was killed. *See* 31 *N.J.* at 192, 156 *A.*2d 1. An Appellate Division opinion extended dram-shop liability to social hosts for damages to third parties caused by serving alcohol to minors in 1976. *See Linn, supra.* It was not until 1982 that a reported decision held a social host liable to a third party for serving a visibly intoxicated adult. *See Figuly v. Knoll,* 185 *N.J.Super.* 477, 449 *A.*2d 564 (Law Div.1982). This Court did not so hold until 1984. *See Kelly, supra.* Similarly, dram-shop liability was extended to package stores that served minors, *see Thompson, supra* (App.Div.1987), before it was extended to package stores that served intoxicated adults, *see Tilton v. Brombacher,* 232 *N.J.Super.* 374, 556 *A.*2d 1337 (Law Div.1989).

Under the contributory negligence regime, a tavern that served alcohol to a minor was no more able to avail itself of a contributory

negligence defense to a dram-shop claim than a tavern that served an intoxicated adult. In *Thompson, supra,* which involved a minor driver and a one-car collision, the Appellate Division stated that the same contributory negligence rule should apply to a minor as to an intoxicated adult. The Appellate Division reasoned:

> Both *Rappaport* and the administrative regulations draw no distinction between minors and those visibly intoxicated who are served or sold alcoholic beverages, since neither would appreciate the import of their actions in operating a motor vehicle when in an intoxicated state.... We see no valid distinction between the preclusion of the contributory negligence defense in the case of the intoxicated patron and that of the underage purchaser. Each is protected by his State-recognized disability.
>
> [216 *N.J.Super.* at 211–12, 523 *A.*2d 269.]

Neither the Appellate Division nor this Court has had occasion, however, to address the proper application of comparative fault principles to a case involving a minor patron where the tavern's potential liability derives solely from its service of alcohol to that patron as a minor. *Cf. Aliulis, supra,* 59 *N.J.* at 510 n. 2, 284 *A.*2d 180 ("No consideration was given to the matter of the bearing on any contributory negligence of plaintiff of unlawful sales of liquor by defendant to her [as a minor] as impairing her judgment in deciding to ride with the intoxicated driver.... Plaintiff's asserted cause of action does not rest on any sales to her."); *Rappaport, supra,* 31 *N.J.* at 205–06, 156 *A.*2d 1 (holding that decedents of motorist killed in collision with car driven by intoxicated minor driver had cause of action against tavern that served the minor); *Benson v. Brown, supra,* 276 *N.J.Super.* at 560–61, 648 *A.*2d 499 (requiring *Lee* instruction where patron alleged to be both underage and visibly intoxicated).

## III

The critical fact is that defendant Kerrigan's fault is based on his intentional and volitional assault on plaintiff. The principles governing the apportionment of fault in cases arising under the Licensed Server Liability Act where the injury is caused by an assault differ from the principles governing apportionment of fault in drunken driving cases. In those cases the principles applied

are based on the special nature of the inquiry concerning foreseeability and causation when the tavern's patron becomes an intoxicated negligent driver. Foreseeability and causation are threshold issues that must be determined before imposing liability on a tavern under the Act. *See N.J.S.A.* 2A:22A-5. Those principles are also relevant to the apportionment of fault in licensed server liability cases. *Cf. Blazovic, supra,* 124 *N.J.* at 112, 590 *A.*2d 222 ("Our view is that the [assaults] that allegedly took place in the parking lot neither were sufficiently foreseeable nor bore an adequate causal relationship to Plantation's alleged [negligent supervision] to justify the imposition on Plantation of the entire responsibility for the resultant injury.").

In recent decades, both the Legislature and the Court have increasingly emphasized the importance of holding the intoxicated driver accountable as well as the tavern who serves her. *See Lee, supra,* 127 *N.J.* at 182–83, 603 *A.*2d 503. Consequently, the *Lee* Court held that juries should be instructed to consider the patron's potential negligence in deciding to drink to the point of intoxication. *See id.* at 183, 603 *A.*2d 503. But at the same time, by establishing a presumption that once a tavern has negligently served an intoxicated patron the patron is ordinarily incapable of assessing the risks of driving, *see id.* at 184, 603 *A.*2d 503, the *Lee* Court also acknowledged what we know from intuition and experience—that it is all too common and foreseeable for intoxicated persons to overestimate their own depleted cognitive ability and motor skills and put themselves and others in danger by their consequent negligence, specifically by attempting to drive. Thus, the tavern's duty toward those who may be injured in this manner is substantial. Similarly, the presumption established by *Lee* also acknowledges the fact that driving in an intoxicated state is a prevalent cause of automobile accidents. Thus, causation often is not a significant issue. These special characteristics of foreseeability and causation in the context of drunken driving are reflected in the history of common law and statutory dram-shop liability in New Jersey, which has focused on the problem of drunken driving, *see supra* at 23–24, 689 *A.*2d at 696, and in the

imposition of liability for drunken driving accidents on social hosts, notwithstanding that social hosts are not liable for other actions taken by their intoxicated adult guests, *see supra* at 24–26, 689 *A*.2d at 696–697.

The correlation between alcohol use and assaultive behavior has not been as well explicated in New Jersey's tort law as the correlation between alcohol use and automobile accidents. Nevertheless, it is clear that such a correlation exists and is recognized by our legal system. For example, in the context of criminal law, this Court recognized that "alcohol is significantly involved in a substantial number of offenses." *State v. Stasio*, 78 *N.J.* 467, 477, 396 *A*.2d 1129 (1979). In *Stasio*, the Court reviewed social science research and found that "[a]nalysis of many studies reflects a high ratio of offenders who have imbibed to those who have not in violent crimes." *Id.* at 477 n. 3, 396 *A*.2d 1129. Similarly, in *State v. Roth*, the Court recognized that "many crimes arise out of drug and alcohol abuse." 95 *N.J.* 334, 368, 471 *A*.2d 370 (1984). In *State v. Kelly*, 97 *N.J.* 178, 194 n. 5, 478 *A*.2d 364 (1984), the Court recognized research indicating that "alcohol is often an important component of violence toward women." Furthermore, the Legislature, in establishing the Division of Alcoholism in the State Department of Health, specifically directed the Department to develop data on alcohol-related problems in New Jersey with "special attention ... given to the relationship of alcohol to automobile accidents, crime, delinquency and other social problems." *See N.J.S.A.* 26:2B–14.

Notwithstanding the correlation between alcohol use and incidence of violent behavior in general, assaults are more aberrational than drunken driving. Therefore issues related to foreseeability and causation in a particular assault case must be treated differently from those issues as they arise in drunken driving cases. Because a tavern is less able to foresee assaults committed by its patrons, and because causes other than intoxication, such as a predisposition to violence or provocation by the victim, are more likely to contribute to the occurrence of an

assault, we do not believe that the assaultive patron is entitled to a presumption that he did not have the capacity to appreciate or control his own actions after being negligently served by the tavern. Such a presumption would, in the case of assaultive patrons, interfere with the jury's ability to focus properly on issues of foreseeability and causation in apportioning fault. Rather, the jury should be instructed to consider the patron's capacity to initiate or refrain from volitional assaultive conduct, as well as all other relevant evidence. We note that this approach is in harmony with the approach taken by *Blazovic* to the apportionment of fault between intentional and negligent tortfeasors in actions based on negligent supervision. *See supra* at 10–14, 689 *A.*2d at 689–691. We also reemphasize that, even in cases in which an intoxicated patron causes injury by negligently operating an automobile, the holding in *Lee* does not preclude the jury from considering all the evidence relevant to apportioning fault, including evidence of negligence other than the negligent decision to drive in an intoxicated state. *See Lee, supra,* 127 *N.J.* at 185–86, 603 *A.*2d 503.

Our decision does not relieve the tavern of the responsibilities imposed on it by the Licensed Servers Liability Act, *N.J.S.A.* 2A:22A–1 to –7. The Act, by incorporating the principles of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3, requires the fact-finder to apportion fault between multiple tortfeasors according to the degree to which each tortfeasor contributed to the incident. *See Lee, supra,* 127 *N.J.* at 185–86, 603 *A.*2d 503. (We note with approval the holding in *Bencivenga, supra,* that the obligation to apportion fault applies only to tortfeasors that are defendants in the litigation. *See* 258 *N.J.Super.* at 411, 609 *A.*2d 1299.) In apportioning fault, the jury should be instructed on the general purpose of tavern liability under the Act—to impose on taverns financial responsibility for injuries proximately caused by negligent service of alcoholic beverages—and that its verdict should reflect the tavern's responsibility for negligent service to the extent that it influenced the behavior of persons

whom the tavern should not have served. The jury should also be informed that, in general, assaultive behavior is considered one of the foreseeable risks of negligent alcohol service. Finally, the court should instruct the jury concerning the heightened duty of taverns to underage patrons under the Act, which deems the licensed server negligent if it serves a person it knew or should have known was underage, regardless of that person's visible level of intoxication. *See N.J.S.A.* 2A:22A-5b. The jury should be apprised of the policy reasons for that heightened duty—the legislative recognition that minors as a class are less likely than adults to drink responsibly and more likely to become intoxicated and pose a danger of harm to others. *See supra* at 27–30, 689 A.2d at 698–699.

Nevertheless, the Act does not impose strict liability on the licensed server for negligence in serving a minor. The jury must determine that the resulting injury was a foreseeable consequence of and proximately caused by the licensed server's negligence. *See N.J.S.A.* 2A:22A-5a(2), (3). Likewise, in apportioning fault, the jury must consider the degree to which the licensed server's negligence in serving alcohol to the underage patron contributed to the incident. We do not have occasion here to specify in detail what the appropriate instruction regarding apportionment of fault would be in the case of an automobile accident caused by an underage patron. In the case of an intentional assault, however, the jury should be instructed to apportion fault on the basis of all the evidence, including evidence of the tavern's negligence in both commencing and continuing to serve the minor, evidence of the minor's fault in deciding to consume the alcohol, evidence concerning the minor's actual degree of intoxication and his capacity to determine whether to refrain from or initiate assaultive behavior, and any evidence of the minor's predisposition to violence or other factors contributing to the incident.

This trial court did not have the benefit of our opinion when it had to rule on these complex issues. The trial court instructed the jury, in part:

> [O]nce the defendant Mums is found to have been negligent in serving Kerrigan, Mums bears the responsibility for Kerrigan's actions thereafter. That responsibility may be diminished only to the extent that Kerrigan's behavior prior to actually consuming a drink, including entering the bar and ordering the drink, contributed to his inability to appreciate the risk of his later behavior.

That instruction, as we now state the law, was incorrect as applied to the comparison of fault between a tavern that is negligent under the Act and an assaultive patron, because it precluded the jury from considering all the legally relevant evidence in apportioning fault among the parties.

The erroneous instruction not only affected the jury's verdict as it pertains to the tavern's liability under the Licensed Servers Liability Act; it also tainted the apportionment of fault to the tavern on the theory of negligent supervision. First, after reviewing the original jury instructions and the repeated instructions responding to the jury's request for clarification, we find that the instruction limiting the fault attributable to Kerrigan might easily have been understood by the jury to govern both theories of liability. Second, even if the jury understood the erroneous instruction to govern only the tavern's statutory liability, if it had not been for that instruction, the jury might well have allocated more fault to Kerrigan and consequently less fault to the tavern on both theories of liability.

## IV

We reverse in part the judgment of the Appellate Division and remand to the Law Division for retrial on the issue of liability only. On retrial, the jury should be instructed, in accordance with the principles outlined in this opinion, to apportion fault between the parties based on all of the evidence pertaining to each party's role in the incident. The alcohol service liability settlement shall remain in effect and the trial court shall mold the verdict to reflect the jury's apportionment of fault on retrial. We affirm the judgment of the Appellate Division on the issue of the trial court's omission of an instruction concerning prejudgment interest, sub-

stantially for the reasons stated in the Appellate Division's opinion.

*For affirmance, reversal and remandance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.