785 A.2d 16 (2001)
345 N.J. Super. 278
Cynthia MARTIN, Plaintiff-Respondent,
v.
PRIME HOSPITALITY CORPORATION, Defendant-Appellant,
and
Sports Authority, Route 46, Ramada Inn, and Reginald Harris, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted October 11, 2001.
Decided November 14, 2001.
*17 O'Toole & Couch, Whippany, attorneys for appellant (Brian R. O'Toole, on the brief).
McDonough, Kiernan & Campbell, Montclair, attorneys for respondent (W. Thomas McDonough, Jr., on the brief).
Before Judges CONLEY, LEFELT and LISA.[1]
The opinion of the court was delivered by LEFELT, J.A.D.
Plaintiff Cynthia Martin was drinking with some friends at the Sports Authority Bar in a Ramada Inn owned and operated by defendant Prime Hospitality Corporation. A guest of the Inn, defendant Reginald Harris, sexually assaulted Martin in his room. Martin sued Prime and Harris seeking compensation for her injuries. After Harris defaulted, an Essex County jury found in favor of Martin and against Prime, awarding Martin $300,000.
Prime appeals, raising several contentions including one we find persuasive that the jury should have apportioned fault among Martin, Prime and Harris and not restricted its focus to whether only Prime was negligent. This appeal thus presents for resolution the proper interpretation of Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222 (1991), in which the Supreme Court held that the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, requires fault to be apportioned between a contributorily negligent plaintiff, a negligent co-defendant bar/restaurant and several co-defendants whose alleged fault was based on intentional conduct. Id. at 92-93, 590 A.2d 222.

I.
From the record of this seven-day trial, the basic essential facts and relevant procedural history that gave rise to this appeal are as follows. Martin, who was twenty-six years old, met her friends Kathryn Mudry and Pamela Rutherford Sorge at a Montclair bar. After socializing and drinking for a few hours, the three friends then traveled in separate cars to the Sports Authority bar in the Ramada Inn at Fairfield.
Shortly after arriving at the Sports bar, Martin began dancing with Mudry, when they were joined on the dance floor by Reginald Harris. Mudry left, leaving Martin and Harris dancing together. Harris had been staying at the Ramada for several months and normally used the same room. Harris told Martin, while they were dancing, that he had a room at the hotel. Martin interpreted Harris's comment as a come-on and became upset. She left the dance floor and returned to her friends.
Martin and her friends struck up a conversation with Dale Baker and Mike Merainer, other patrons seated nearby. While Sorge played pool with Baker, Martin danced with Merainer. Meanwhile, Harris approached Mudry and their discussion became so heated that Harris accused her of being a racist. Martin then demanded *18 that Harris apologize to her friends. Shortly thereafter, Harris apologized to the three women and bought them a round of drinks.
Around 11:00 P.M. Martin and her friends decided to leave. Mudry and Sorge did. However, upon entering her car, Martin realized she "was just loaded," and in no condition to drive. Both Mudry and Sorge testified that Martin did not appear to be intoxicated. In fact, Sorge testified that she felt certain that Martin was not in any trouble and was capable of driving home. Merainer and Baker both testified, however, that they believed Martin to be intoxicated from the time they first observed her at the Sports bar.
Martin returned to the Inn and attempted to call her boyfriend from a payphone, but could not get through. She decided to go back to the bar and wait there until she sobered up. When Merainer and Baker came over, she explained to them that she could not reach her boyfriend. Martin declined Merainer's and Baker's offer to get a taxi because she did not want to leave her car. Harris then came over and indicated that Martin should get a taxi and that he would help.
Harris took Martin to his table. Harris suggested that she use the phone in his room where "it was very quiet," and where she "could relax." Though she hesitated at first, Harris persuaded her to go to his room to use his phone. Chris Strumolo, the doorman/bouncer at the Sports bar, testified that Martin and Harris walked past him "arm in arm" toward Harris' room.
About fifteen minutes later, Harris returned to the bar to purchase a pack of cigarettes and glass of wine for Martin. Merainer and Baker confronted Harris who told Merainer that he had no intention of taking advantage of Martin and that he was simply calling her a cab. During this period, while Harris was not in the room, Martin made two calls from Harris's room to the front desk asking for instructions on making an outside call.
Later, after Harris had returned to his room, Baker and Merainer remained suspicious and approached the night auditor, Nelson Avilla. They asked Avilla whether a cab had been called for Martin. Hearing that no cab had been called, Merainer and Baker became concerned and indicated to the night manager, Kim Graney, that Martin might be in danger. They asked her to call Harris's room to ensure that she was safe. Chris Strumolo, the doorman/bouncer, who had seen Harris and Martin walk out arm in arm was there "throughout the whole conversation." Sometime during this period, Harris had ordered an adult film for his room.
Graney, after calling her manager on the phone, telephoned Harris "to make sure that everything was ok." Graney testified that Harris told her that everything was fine, though she added that he "seemed to be in a hurry to get off the phone." While on the phone with Harris, Graney heard a "low moaning or crying," but could not tell the character of the sounds or whether they were coming from the television. In any event, Graney testified that she was not alarmed by her conversation with Harris, who she knew from his stay at the Inn.
Meanwhile in Harris's room, which was only three doors from the front desk, Martin had only fragmented memories of what transpired. She remembered Harris pushing her back on his bed, not letting her make the phone call, covering her mouth while penetrating her vaginally, attempting to sodomize her and forcing her to perform oral sex. She remembered running to the door at least twice but being unable to open it. She also remembered screaming, banging on the wall, and *19 hysterically crying, though Graney testified that at the front desk no screaming or banging was heard coming from Harris's room.
Baker and Merainer persisted in their attempts to get Graney to investigate and asked her for Harris's room number so they could look into it on their own. Graney refused, citing hotel policy. She said she could not help any further and suggested that they call the police if they were still concerned. Finally, Baker or Merainer called the police who arrived shortly thereafter to find Martin completely naked lying on top of a white shirt and bra and hysterically crying. Martin testified that she was "repeating over and over, `I'm so glad you found me. I thought he was going to kill me.'" Martin had a bruise on the top of her right shoulder and two red marks, one on each knee.
The police had never before responded to the Ramada or Sports Authority for any type of prior rape or sexual assault incident. Before this incident, during the months that Harris stayed at the Ramada, he never gave either the bar or the Inn any indication that he might cause trouble. In fact, both the doorman/bouncer and Graney believed Harris to be friendly and helpful.
After being arrested and indicted, Harris spent fifteen months in jail awaiting trial on three counts of second-degree sexual assault and one count of third-degree criminal restraint. Harris subsequently plead guilty to fourth-degree sexual contact and third-degree criminal restraint and was sentenced to probation and time served.
Martin sued Prime and Harris civilly. After being properly served in the civil suit, Harris defaulted and Prime obtained a default judgment against him on its cross-claim. Thereafter, Martin's trial then proceeded against Prime. The trial judge submitted the case to the jury solely on the issue of whether Prime was negligent in failing to provide adequate security for the safety of Martin. Despite Prime's vigorous argument and requested jury charge, the judge refused to allow the jury to compare fault among Prime, Martin and Harris.

II.
We agree with the trial judge that apportionment of fault is not appropriate in all circumstances. See Blazovic, supra, 124 N.J. at 111, 590 A.2d 222. Moreover, we acknowledge that the Restatement (Third) of Torts: Apportionment of Liability § 14 (2000), provides that a "person who is liable to another based on a failure to protect the other from the specific risk of an intentional tort is jointly and severally liable for the share of comparative responsibility assigned to the intentional tortfeasor in addition to the share of comparative responsibility assigned to the person." Comment b to § 14 of the Restatement explains its position as follows:
The modification of joint and several liability and the application of comparative responsibility to intentional tortfeasors create a difficult problem. When a person is injured by an intentional tort and another person negligently failed to protect against the risk of an intentional tort, the great culpability of the intentional tortfeasor may lead a factfinder to assign the bulk of responsibility for the harm to the intentional tortfeasor, who often will be insolvent. This would leave the person who negligently failed to protect the plaintiff with little or no compensation for the harm. Yet when the risk of an intentional tort is the specific risk that required the negligent tortfeasor to protect the injured person, that result significantly diminishes the purpose *20 for requiring a person to take precautions against this risk.

[RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB. § 14 cmt. b (2000).]
Nevertheless, in this state, we have not completely embraced this particular section of the Restatement, and Blazovic v. Andrich, supra, 124 N.J. 90, 590 A.2d 222, remains the law. Blazovic was injured in a confrontation with other patrons in a restaurant/bar's parking lot. In Blazovic, the Court held that the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, requires apportionment of fault among a negligent plaintiff patron, a negligent codefendant restaurant/bar and several settling co-defendants whose fault was based on intentional conduct. Blazovic, supra, 124 N.J. at 92-93, 590 A.2d 222.
Blazovic specifically held "that the Comparative Negligence Act applies to conduct characterized as intentional," id. at 112, 590 A.2d 222, and was intended to cover fault in a broad sense, id. at 98, 590 A.2d 222 (citing Suter v. San Angelo Foundry and Machine Co., 81 N.J. 150, 406 A.2d 140 (1979)). Blazovic thus clarified that "responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault, including the fault attributable to an intentional tortfeasor." Id. at 107, 590 A.2d 222.
In reviewing the Appellate Division's decision in Blazovic, the Supreme Court noted Judge Landau's dissent, which argued, in accordance with the Restatement, "that plaintiffs would be disadvantaged if fault were substantially allocated to intentional wrongdoers who were not financially able to satisfy the judgment." Id. at 110, 590 A.2d 222. The Court rejected this analysis "because it ignores the principle that the parties causing any injury should be liable in proportion to their relative fault." Ibid.
In addition, the Court recognized that it was adopting a position that has not been widely accepted. Blazovic specifically noted that "most courts that have considered the issue have declined to extend comparative-fault principles to conduct characterized as intentional." Id. at 100, 590 A.2d 222 (citations omitted). The Court specifically noted that it was "unpersuaded by the decisions of other jurisdictions that reject apportionment of fault in actions involving intentional tortfeasors." Id. at 106, 590 A.2d 222. Thus, despite, our dissenting colleague's concern expressed in Blazovic and the many courts that have rejected the principle, the Supreme Court mandated apportionment of fault between negligent and intentional tortfeasors.
In 1997, the Court reaffirmed its holding in Blazovic in Steele v. Kerrigan, 148 N.J. 1, 35, 689 A.2d 685 (1997). Steele, a tavern patron, was assaulted by an underage patron who had been served alcohol by the tavern. Id. at 7, 689 A.2d 685. Steele's claims against the bar owner and the underage patron were based on common law negligence as well as the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, N.J.S.A. 2A:22A-1 to -7. Id. at 7-8, 689 A.2d 685.
In Steele, the Court found that responsibility for plaintiff's assault was to be apportioned between the intentional tortfeasor and a defendant charged with negligent supervision of the premises. Steele, supra, 148 N.J. at 10-15, 689 A.2d 685. The Court once again specifically noted its unwillingness to follow case law from other jurisdictions that declined to compare fault between negligent and intentional tortfeasors. Id. at 12, 689 A.2d 685. The "Court noted that those cases were generally decided under contributory negligence regimes and were therefore aimed at circumventing the harsh effects of a complete bar to recovery." Ibid. The Court reiterated its observation that "[r]efusal to compare the negligence of a *21 plaintiff whose percentage of fault is no more than fifty percent with the fault of intentional tortfeasors is difficult to justify under a comparative-fault system in which that plaintiff's recovery can be only diminished, not barred." Ibid., (quoting Blazovic, supra, 124 N.J. at 106, 590 A.2d 222).
Furthermore, Steele, supra, 148 N.J. at 11, n. 2, 689 A.2d 685, noted that after Blazovic had been decided "[t]he 1995 amendments to the Comparative Negligence Act inserted `negligence or fault,' clarifying that the fact-finder must apportion all fault attributable to each party." See L. 1995, c. 140, § 1 (codified at N.J.S.A. 2A:15-5.2). Thus, the Legislature has apparently accepted Blazovic as correctly interpreting the Comparative Negligence Law.
Under current law, therefore, when a plaintiff claims injury from an intentional tort caused by negligent security or supervision, the jury must apportion fault between the negligent and intentional tortfeasors. Blazovic specifies the circumstances where it would be inappropriate to apportion either a plaintiff's negligence or the fault of an intentional tortfeasor.
As explained in Blazovic, the defendant responsible for security should be precluded from relying on plaintiff's contributory negligence to offset its own responsibility only in circumstances where that defendant's duty encompassed the obligation to prevent the plaintiff's allegedly inappropriate conduct. Blazovic, supra, 124 N.J. at 111, 590 A.2d 222 (citing Cowan v. Doering, 111 N.J. 451, 458-67, 545 A.2d 159 (1988); Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 165-68, 406 A.2d 140 (1979); Soronen v. Olde Milford Inn, Inc., 46 N.J. 582 589-92, 218 A.2d 630 (1966)). Regarding the intentional tortfeasor, the defendant responsible for security would be precluded from relying on apportionment only when that defendant's duty of care encompasses the obligation to prevent the specific misconduct that caused plaintiff's injury. Id. at 111, 218 A.2d 630 (citing Butler v. Acme Markets, Inc., 89 N.J. 270, 445 A.2d 1141 (1982)). Because there appears to be growing confusion regarding the breadth of these exceptions to Blazovic's general rule, we discuss both in some detail as they relate to the facts of this case.

1. Plaintiff's Negligence
The trial judge in this case believed that Prime's obligation to provide security would be undercut if the plaintiff's contributory negligence was compared and apportioned. The judge reasoned that Prime "was under an obligation to prevent what occurred to the plaintiff in her condition, whether she was intoxicated or whether she was not." Prime's duty according to the judge "was to prevent the conduct of Harris ... in the sexual attack upon the plaintiff." Thus, the judge concluded that Prime's duty of care subsumed an obligation to protect plaintiff from her own inappropriate conduct.
Prime, however, was not an insurer of plaintiff. Duty often is defined by the foreseeability of the particular harm to be guarded against. See Hill v. Yaskin, 75 N.J. 139, 144, 380 A.2d 1107 (1977). Along with foreseeability, policy questions also play a role in determining duty. See Caputzal v. Lindsay Co., 48 N.J. 69, 75, 222 A.2d 513 (1966). However, "whether a DUTY exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution." Kelly v. Gwinnell, 96 N.J. 538, 544, 476 A.2d 1219 (1984)(quoting Goldberg v. Housing Auth., 38 N.J. 578, 583, 186 A.2d 291 (1962)).
*22 Here, Prime had a duty to protect plaintiff, whether she was drunk or sober, as noted by the trial judge, but only from foreseeable injuries, and only by reasonable actions. Butler v. Acme Markets, Inc., supra, 89 N.J. at 280, 445 A.2d 1141 (citing RESTATEMENT (SECOND) OF TORTS § 344 at 225-26, cmt. f (1965)); See also Kuzmicz v. Ivy Hill Park Apartments, 147 N.J. 510, 517, 688 A.2d 1018 (1997) ("landlords and business owners should be liable for foreseeable injuries that occur on their premises"). In short, Prime should have exercised reasonable care to protect plaintiff. In exercising such care, Prime should have taken reasonable steps to discover whether plaintiff was in danger or likely to be in danger and, if so, given warning or otherwise taken steps to protect plaintiff from the danger. Ranalli v. Edro Motel Corp., 298 N.J.Super. 621, 627-28, 690 A.2d 137 (App.Div.1997); RESTATEMENT (SECOND) OF TORTS § 344 (1965).
Here, plaintiff's inappropriate conduct, as claimed by Prime, however, included plaintiff drinking to a point where plaintiff's reason was impaired, according to her own testimony. Plaintiff has had a long struggle with drinking. Between the ages of 15 and 18, Martin admitted to being hospitalized "a couple of times" for excessive drinking. She admitted that she didn't "really know when to stop" and that she kept "drinking and drinking and drinking" until she could not stop. Despite knowing that she had a drinking problem, Martin drank in the Sports bar. Indeed, while now recognizing that she is an alcoholic, Martin continues to drink.
Under Blazovic, plaintiff's contributory negligence should not be apportioned only when the restaurant/bar defendant's duty encompasses the obligation to prevent plaintiff's inappropriate conduct, in this case, her voluntary excessive drinking.
It has long been prohibited for a bar to serve alcoholic beverages to anyone who is "actually or apparently intoxicated." Soronen, supra, 46 N.J. at 586, 218 A.2d 630 (quoting Rappaport v. Nichols, 31 N.J. 188, 202, 156 A.2d 1 (1959)). In Soronen, the court precluded the contributory negligence defense from being asserted by a tavern who had served a visibly intoxicated plaintiff who died from a fall. Id. at 584, 218 A.2d 630. The court pointed out that the tavern's accountability may not be diluted by the patron's fault "for that would tend to nullify" the tavern's obligation. Id. at 592, 218 A.2d 630; see Lee v. Kiku Restaurant, 127 N.J. 170, 186, 603 A.2d 503 (1992) (limiting plaintiff's contributory negligence to the point he or she becomes visibly intoxicated).
In the present case, there was some evidence that Martin was intoxicated while at the Sports bar. Unlike Soronen, supra, 46 N.J. at 589-92, 218 A.2d 630, however, it was not argued that Prime negligently sold alcohol to Martin while she was visibly intoxicated or that Prime contributed to her intoxication. This case was not tried on that basis.
Indeed, the evidence also showed that approximately forty-five minutes passed between the time when Martin discovered that she could not drive home and when she returned to the bar. After Martin returned to the bar, she admitted that drinking was no longer involved. Thus to the extent that plaintiff's voluntary drinking placed herself in a precarious position, her conduct can constitute negligence. Tiger v. American Legion Post Number 43, 125 N.J.Super. 361, 368-69, 311 A.2d 179 (App.Div.1973); Anslinger v. Martinsville Inn, Inc., 121 N.J.Super. 525, 534, 298 A.2d 84 (App.Div.1972). A "jury might find from the evidence that by voluntarily over-indulging in intoxicating liquor, with knowledge of the effect it would have upon *23 her, plaintiff allowed her faculties to become impaired to the extent that she was unaware of what was happening and thereby exposed herself to danger and injuries which a sober person of ordinary prudence and foresight would have avoided." Tiger, supra, 125 N.J.Super. at 368, 311 A.2d 179.
Plaintiff was not completely free of fault as in, for example, Bencivenga v. J.J.A.M.M., Inc., 258 N.J.Super. 399, 411, 609 A.2d 1299 (App.Div.1992), where plaintiff was assaulted because of an apparent misconception. Here, plaintiff's drinking and poor judgment brought herself to the scene of her injury. See Lee v. Kiku Restaurant, supra, 127 N.J. at 185, 603 A.2d 503. She had "some responsibility for her own well-being, even if it was to exercise only that degree of care that a person in her condition was capable of exercising." See Cowan v. Doering, 111 N.J. 451, 469, 545 A.2d 159 (1988) (Clifford, J. dissenting (commenting on a mentally-disturbed plaintiff)).
This was not a situation like Cowan, supra, 111 N.J. at 455-56, 545 A.2d 159, where defendant hospital had prior notice that the plaintiff was likely to act in the specific manner she chose to injure herself. Notably, the Court found that "[t]he duty of care to prevent self-inflicted harm arises in this case because there was a foreseeable risk that plaintiff's condition, as it was known to defendants, included the danger that she would injure herself." Id. at 462, 545 A.2d 159. The Court concluded that "because defendants' duty of care was coextensive with the plaintiff's ability to avoid self-damaging acts, the withdrawal of contributory or comparative negligence supports the policy that undergirds our `fault-based' system of tort law, particularly the discouragement of unreasonable conduct, is not undermined." Id. at 466, 545 A.2d 159.
Comparison of plaintiff's fault in the instant case was appropriate and required under Blazovic because Prime's duty, under the facts of this case, related to security and properly protecting plaintiff after she claimed to be intoxicated upon her return to the bar. Considering plaintiff's inappropriate drinking, which placed her in a precarious situation, would not in this case dilute or diminish Prime's duty of care.

2. Intentional Tortfeasor
Plaintiff also specifically argues, that "if Harris had been at least questioned, plaintiff's presence in the hotel room and her simple need for assistance in getting home would have been discovered and addressed." Thus, plaintiff contends that if Prime had properly performed its duty, she would not have been sexually assaulted.
The trial judge applied § 24 of the Torts Restatement of Law, [now § 14, and quoted above]. The judge concluded that "the duty of the defendant, [Prime], was to prevent the conduct of Harris inin the sexual attack upon the plaintiff." The imposition of comparative negligence, in the judge's view, would "lead to the ... diminution of a duty of care."
Prime's duty of care certainly included taking reasonable steps to protect its patrons from foreseeable sexual assaults. However, the situation here, is quite different from that present in, for example, Butler v. Acme Markets, Inc., supra, 89 N.J. 270, 445 A.2d 1141. Unlike Butler where there was a history of prior criminal attacks, Prime had no warning that Harris constituted a danger to its patrons. Harris had been living at the Ramada Inn for approximately four months before the incident. During that entire period, he provided no indication that he might prove to be dangerous.
*24 At best, a factual dispute was present regarding whether Prime adequately performed its duty to exercise reasonable care to protect plaintiff. There were factual disputes about whether Prime should have realized that Martin was in danger or whether Prime should have attempted to enter Harris's room or speak directly with Martin before the police were called.
The evidence that supported the argument that Harris and Martin were engaged in consensual sex, was relevant in determining whether to allow comparative fault and whether Prime breached its duty to plaintiff. All of the indications of consensual sex, in fact, muddied the reasonable care that Prime must exercise. This evidence tended to minimize any reasonable perception by Prime of an imminent danger of sexual assault by Harris. For example, Martin's phone calls from Harris's room, the adult film that was ordered by Harris, the cigarettes and glass of wine that Harris purchased ostensibly for plaintiff, the closeness of Harris's room to the front desk, and the doorman/bouncer's observation of Harris and Martin walking arm in arm all indicate that a sexual assault was neither occurring nor about to occur, and that Martin was not in need of any protection from Harris.
In this case, Prime's duty of care did not as a matter of law encompass an obligation to prevent the sexual assault. There were too many factual disputes present regarding what would have been reasonable conduct by Prime under these circumstances. It cannot be said that Prime's duty subsumed an obligation to prevent the plaintiff from entering Harris's room or required that Prime speak directly with Martin while she was in Harris's room, or take any other steps to remove Martin from Harris's room. The actions that Prime should have taken under the circumstances were factually disputed. It was up to the jury to determine whether the steps Prime took to investigate the situation were reasonable under the circumstances.
The sexual assault committed by Harris was neither sufficiently foreseeable nor sufficiently related to Prime's alleged fault to justify imposing responsibility on Prime for all of Martin's injuries. See Blazovic, supra, 124 N.J. at 112, 590 A.2d 222. The sole fact that Harris pled guilty to a crime would also not bar apportionment under Blazovic. See Bonpua v. Fagan, 253 N.J.Super. 475, 479, 602 A.2d 287 (App. Div.1992). Accordingly, under Blazovic, in our opinion, Harris's fault should have been compared and apportioned.

III.
In conclusion, to determine when Blazovic excuses apportionment, the overall focus is on whether plaintiff's injury was so foreseeable to the supervising defendant that a failure to act or an inadequate response that causes the plaintiff to suffer the foreseeable injury warrants imposition of the entire fault upon that defendant. Blazovic, supra, 124 N.J. at 112, 590 A.2d 222. Just as in Blazovic that was not the case here.
Because the jury considered only Prime's negligence, we must reverse and remand for a new trial. Plaintiff and defendant dispute the scope of any new trial that is ordered. We do not believe that the failure to apportion responsibility, affected the damage award. Thus, damages will not be retried. Truchan v. Sayreville Bar And Restaurant, Inc., 323 N.J.Super. 40, 53, 731 A.2d 1218 (App.Div.1999) ("the damage issue need not be relitigated since we conclude that the liability issues and the damages issues were fairly separable.").
*25 We expect that the proofs on liability may be quite similar to those presented in the first trial. However, the jury on the retrial should be told that both Prime and Harris have previously been determined to have been at fault and they are to decide if plaintiff, too, was at fault and the respective degree of fault of all parties.
Because the matter must be retried, we briefly address the other points raised by Prime in the appeal.
Prime contends that defendant's expert security witness should not have been asked by plaintiff whether he believed that Martin had been raped. We disagree. Cross-examination is permitted on matters affecting the credibility of witnesses, and it seems to us that the evidence relates to the expert's potential partiality. N.J.R.E. 611(b). There was no error here.
Plaintiff presented a Training and Intervention for People Serving Alcohol videotape that explained how defendant's employees were trained to handle visibly intoxicated patrons. Because this training was illustrative of reasonable steps that Prime might have taken or not taken to protect its patrons, the tape was relevant. There was evidence, for example, that when Martin called from Harris's room for instructions on calling outside the hotel, Aviles who answered the phone believed her speech was slurred. Thus, the tape was relevant to steps that Prime may have taken or failed to take to properly protect Martin.
Prime believes that because plaintiff read portions of Aviles statement to the jury, it should be entitled to admit the entire statement. Prime, however, makes an inadequate showing that fairness required other parts of the statement to be admitted. N.J.R.E. 106; R. 4:16-1(d).
In conclusion, the only issue raised by Prime, which we believe meritorious is the one we reverse and remand onthe application of Blazovic v. Andrich, supra, 124 N.J. 90, 590 A.2d 222. All of Prime's other points have insufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).
Reversed and remanded for further proceedings in accordance with this decision.
NOTES
[1] With the consent of counsel, Judge Lisa, not originally assigned to hear this case, has joined in its consideration and in this opinion.