942 A.2d 882 (2008)
399 N.J. Super. 71
Kathleen V. BAUER, Administratrix ad prosequendum for the Estate of James Allan Hamby, and Individually, Plaintiff-Appellant
v.
Frederick NESBITT, III, driver, Julia Nesbitt, owner, Defendants, and
C View Inn, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 24, 2007.
Decided March 20, 2008.
R.C. Westmoreland, argued the cause for appellant (Westmoreland Vesper & Quattrone, attorneys, West Atlantic City; Mr. Westmoreland and Kathleen F. Beers, on the brief).
Terence M. King, argued the cause for respondent.
*884 Before Judges AXELRAD, PAYNE and SAPP-PETERSON.
The opinion of the court was delivered by
PAYNE, J.A.D.
Kathleen Bauer, suing as the administratrix ad prosequendum of the estate of James Allan Hamby and individually, appeals from an order of summary judgment dismissing her wrongful death and survivorship claims against a Cape May bar and restaurant, the C View Inn, arising from a single-ear motor vehicle accident, occurring on September 3, 2003, caused by the car's intoxicated nineteen-year-old driver, Frederick Nesbitt, III. Upon analysis following the accident, Nesbitt's blood-alcohol concentration was found to be .199.
Causes of action were premised upon alleged violations of the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act (the Dram Shop Act), N.J.S.A. 2A:22A-1 to-7, and upon common law negligence. The motion judge found the Dram Shop Act inapplicable to the case, because liability under it was limited to instances in which there was service of alcohol, and although decedent Hamby was served beer, there was no evidence of service of any alcohol by the C View Inn to Nesbitt. He dismissed common-law causes of action such as negligent supervision that were unrelated to service of alcohol, holding that the Dram Shop Act preempted the field.

I.
In granting summary judgment, the trial judge was required to view the competent evidence in a light most favorable to plaintiff, drawing all inferences in her favor, and on that basis determine whether a genuine issue of material fact precluded summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). We are governed by the same standard. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). Our review of the law applicable to the facts is plenary. Manalapan Realty v. Manalapan Tp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
The facts, viewed as required by the Brill standard, disclose the following. At 5:30 p.m. on the day of the accident, defendant Nesbitt picked up his close friend, twenty-one-year-old Hamby, at Hamby's home. At the time, Hamby's license was suspended as the result of a conviction for driving while intoxicated. He therefore did not drive at any point during the evening. Although Nesbitt's and Hamby's eventual destination was the C View Inn, where they planned to meet friends for their regular Wednesday "Wing Night" gathering, Nesbitt and Hamby first stopped at the Seaville Tavern, where Hamby purchased either a twelve-pack or eighteen-pack of beer, as well as a pint of Captain Morgan rum. The two started drinking beer as soon as Hamby returned to the car. Nesbitt then drove to the home of a friend, Wade Dickinson who, they learned, had gone to a house in North Cape May occupied by a friend in the Coast Guard. After learning of Dickinson's whereabouts, Nesbitt drove Hamby to North Cape May, drinking along the way. They remained in North Cape May, socializing with the people there, for approximately two hours. According to the statement given by Nesbitt to the State Police on the day after the accident, Nesbitt drank a small bottle of rum during his stay.
Nesbitt and Hamby then proceeded to the C View Inn, where they met their friends Dickinson, Jason Kleinschmidt, and Kevin Smith, all of whom were at least *885 twenty-one years of age. En route, Nesbitt and Hamby each drank one beer. In his deposition, Nesbitt testified that he also probably drank in the parking lot of the Inn. After entering the Inn at approximately 7:00 p.m., the five proceeded to a table located two- to six-feet from the Inn's bar. As illustrated in drawings made by Dickinson and Kleinschmidt at their depositions, the table was situated perpendicular to the bar, with no tables intervening between it and the bar. Kleinschmidt testified that Nesbitt and Hamby sat on the right side of the table, with Nesbitt closest to the bar. Dickinson sat opposite Nesbitt; Kleinschmidt sat opposite Hamby; and Smith sat at the end of the table farthest from the bar. The head of the table remained open throughout all but one fifteen-minute period during the evening. Although seating existed along the bar itself, the head of the table occupied by the five friends faced a waitress station, and thus no seated bar customers blocked the view of the table by the two bartenders. This fact was confirmed by Kleinschmidt in his deposition, who stated:
at that particular seat there would be nothing obstructing their [the bartenders'] view because, as I have noted here, in the center of the bar, which is directly in front of our table, there is a waitress station there where they drop off the dirty places, that's where they keep the condiments and stuff like that for the cocktails and all.
Wing Night was a popular event for the Inn, and approximately sixty people were present in the bar and restaurant areas. The bar was "somewhat crowded" when the group walked in, but the table chosen by the five, consisting of two smaller square tables pushed together, remained empty. In his deposition, Kleinschmidt confirmed that sixty people "at most" were in the bar, but he stated, "was it packed, no." He later agreed that Wing Night was popular in Cape May, but that he "wouldn't say" that particular night "was a busy night." Nesbitt testified that the noise level at the Inn that night was "medium."
Once seated, Kleinschmidt, Dickinson, Smith, and Hamby ordered pitchers of beer with frosted glasses, along with chicken wings. Nesbitt, who was known to the Inn's employees to be underage and did not look to be twenty-one, ordered a Coke. There is no evidence that he was ever served alcohol by an employee of the C View Inn, and there is no direct evidence that he drank the beer that had been ordered by the others. However, Nesbitt testified at his deposition that Hamby. spiked Cokes ordered by Nesbitt on two occasions, placing the glass beneath the table when doing so to avoid detection. Their server that evening was Casey Walker, a young woman who had graduated from high school with Nesbitt and was acquainted with him. Her service was attentive, since the group habitually gave large tips. Kleinschmidt described Walker's behavior at his deposition in the following exchange regarding the provision of new frosted mugs:
Q. But you've had times when you would drink out of a pitcher with other people and you would finish a pitcher and maybe another pitcher was brought. Had you ever been a part of that situation?
A. Yes.
Q. Would you get a new mug with that pitcher or did you have to request it?
A. You'd have to request it.
Q. The night that we're talking about with Casey [Walker], did you request it each time or did she just know you guys and

*886 A. She just knew what we wanted, yeah, every time.
Q. So even going in that night when you got your first refill, so to speak, you didn't have to say, "Casey, give me a fresh mug." She knew it?
A. She knew it right away. She'd take the old mugs away and then she would bring us four new ones.
Descriptions of the quantity of alcohol consumed in the two and one-half hours that the five remained at the Inn varied. Nesbitt testified that each of the other four ordered a pitcher of beer, and more than one person had more than one pitcher. Walker testified that the group as a whole ordered three or four pitchers of light beer, and that "two of them had Grey Goose and orange in a tall glass, . . . and maybe two or three of them were served to that table." If Dickinson is to be believed, by the end of the friends' two and one-half hour stay at the Inn, he and Hamby were "pretty much intoxicated," both having drunk eight to twelve frosted mugs of beer there, in addition to whatever they had drunk previously.
Both Kleinschmidt and Dickinson gave deposition testimony regarding signs of intoxication on the part of Hamby and Nesbitt at the Inn. The following exchange occurred with Kleinschmidt at his deposition with respect to Jay Hamby:
Q. Okay. At any point during the evening while you were in the bar did you notice that Jay appeared to be showing signs of having been drinking?
A. Yeah.
Q. What did you notice?
A. Him showing off his tattoos the way he did; the tattoos that he wanted to get in the future he was talking about. He showed us one of his piercings.
Q. Okay. Now . . . when he did that kind of thing, that was an indicator to you that he was getting intoxicated?
A. People sober do not whip their penis out onto the table and show you their piercing.
Q. Okay. Is that what he did that night?
A. Yes, he did.
Q. Okay. About what time was that?
A. Oh, about nine o'clock.
* * *
Q. Now, although it may be enough, was there anything, any other behavior on the part of Jay that led you to believe that he was intoxicated by that time?
A. Other than that, him saying he wanted to get a smiley face tattooed on his penis, too, that was about all I could take. . . .
Kleinschmidt testified additionally that in the period leading up to Hamby's exposure of his penis,
He'd go through periods of, like, being quiet, and then he'd all of a sudden get all loud. If somebody said something exciting, he'd like jump right in the conversation, but he seemed like he was getting a little louder than usual at that time.
When asked, "[w]as it the kind of loud where somebody at the next table would notice," Kleinschmidt responded: "Absolutely would." He continued, "they definitely would notice that. And I'm surprised that nobody noticed him do that."
Although giving graphic testimony regarding Hamby's intoxication, Kleinschmidt testified that Nesbitt showed no signs of being drunk. However, Dickinson testified otherwise, describing Hamby as not having glassy eyes or engaging in loud conversations, but then stating:
The only person that was talking louder was Freddie [Nesbitt], as a matter of *887 fact, and I couldn't understand why. His voice would raise like he was almost yelling and using foul language, and we didn't want to use foul language, we wanted to try to have respect, it was more or less a restaurant, not a bar, but we went there for one reason and that was to drink.
Dickinson stated that Nesbitt was "loud, real loud," and he agreed that Nesbitt got louder as the evening wore on.
No evidence was presented that Inn personnel ever sought to cut off service of alcohol at the table or to otherwise insure the safety of the five friends when leaving, although Casey Walker testified that on other occasions the Inn would call a cab for intoxicated patrons. Walker also testified that on at least one other occasion, she had alerted the Inn's bartender/manager, Paul Farnan, when she thought patrons were becoming disruptive. Farnan then offered the patrons a cab, and when one resisted, Farnan threatened to call the police. Farnan testified at his deposition that the Inn's unwritten policy regarding intoxicated patrons, which he described as ones exhibiting "loud, aggressive behavior," was to "advise the bar manager and then the action then would be either have the people he is with take he or she home. If the person becomes unruly, then we call the police." The Inn was not a member of the New Jersey HERO Campaign for designated drivers, although Farnan was aware of the enterprise.
Hamby, Nesbitt, Kleinschmidt, Dickinson, and Smith left the Inn at approximately 9:30 p.m. Kleinschmidt testified that Hamby and Nesbitt left together, ahead of the rest of the group. He described Hamby's condition at the time in the following exchange:
Q. At that point can you tell me first with respect to Jay [Hamby], was he showing signs of being intoxicated at that point or under the influence of
A. No, he was under the influence of alcohol, yes.
Q. And what about his behavior would lead you to that conclusion?
A. Him hanging out of the passenger-side window as they're driving off.
Q. Explain to me what you mean by that, hanging out of the passenger-side window?
A. He had half of his body hanging out of the passenger window screaming at me, Kevin, and Wade as we were leaving.
Q. Do you know what he was screaming?
A. No. He was just hooting and hollering. They seemed like they were having a good time when they left. He seemed fired up for some reason. . . .
Q. So in your opinion then, and correct me if I'm wrong, Jay Hamby when he left the bar was clearly intoxicated?
A. Absolutely.
Kleinschmidt did not regard Nesbitt to be intoxicated at the time. Nesbitt proceeded to drive Hamby home, taking the Garden State Parkway north to do so. The accident occurred at approximately 10:35 p.m. Witnesses who observed Nesbitt's car in the period shortly before his accident stated to the State Police that Nesbitt had been speeding, one stating that he had been passed "like he was sitting still." After passing a second vehicle, Nesbitt's car crossed onto the left shoulder and entered the grass berm. The car then turned to the right and, after Nesbitt's further efforts to regain control failed, commenced skidding sideways to the right, leaving the highway, striking the bullnose of a guard rail, and overturning completely while in the air and landing on the driver's side. Nesbitt was thrown *888 out of the back window of the vehicle; Hamby remained inside, and was pronounced dead at the scene. The State Police declared the cause of the accident to have been driving while under the influence of alcohol and excessive speed.
Nesbitt testified that he never saw the rum bottle again after leaving the C View Inn. There is no other evidence whether Nesbitt and Hamby continued drinking on their drive home. Nesbitt, who pled guilty to second-degree vehicular homicide and was sentenced to five years in prison, testified at his deposition that he was under the influence when he left the Inn. Additionally, when providing a factual basis for his plea, Nesbitt acknowledged that he "probably had way too much to drink" and that he "shouldn't have been driving." As stated, Nesbitt's blood alcohol level at the hospital after the accident was found to be .199.
In February 2006, Hamby's expert, Thomas Hand, stated in a report filed in connection with this matter that:
Defendant driver Nesbitt based on his BAC as evidenced by the police was definitely above a .10 in the C-View Inn, and therefore would have been showing obvious physical signs of intoxication in the C-View bar before he left the premises.
After setting forth his reliance on the deposition testimony of Kleinschmidt and Dickinson with respect to the conduct of Hamby and Nesbitt, respectively, Hand stated further:
The bartender and/or barmaid who could have easily seen and/or heard this outrageous behavior, should have taken corrective action. The corrective action should have been taken including: making certain that the young underage patron, Nesbitt, did not operatic] any vehicle, and that the remaining patrons obtain alternative transportation. . . .

II.
The liability of the C View Inn for the service of alcohol is governed by N.J.S.A. 2A:22A-5, enacted in 1987, which provides:
a. A person who sustains personal injury or property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover damages from a licensed alcoholic beverage server only if:
(1) The server is deemed negligent pursuant to subsection b. of this section; and
(2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and
(3) The injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.
b. A licensed alcoholic beverage server shall be deemed to have been negligent only when the server served a visibly intoxicated person, or served a minor, under circumstances where the server knew, or reasonably should have known, that the person served was a minor.
The Act constitutes the exclusive remedy for persons injured as the result of negligence involving the service of liquor by a commercial establishment, N.J.S.A. 2A:22A-4; Verni ex tel. Burstein v. Harry M. Stevens, Inc., 387 N.J.Super. 160, 187, 903 A.2d 475 (App.Div.2006), certif. denied, 189 N.J. 429, 915 A.2d 1052 (2007) (citing Fisch v. Bellshot, 135 N.J. 374, 382, 640 A.2d 801 (1994) and Truchan v. Sayreville Bar and Rest, Inc., 323 N.J.Super. 40, 53, 731 A.2d 1218 (App.Div.1999)). Moreover, negligence is defined narrowly by the Act as the service of alcohol to a visibly intoxicated patron, and is not defined by reference to regulations or standards governing *889 dispensers of alcoholic beverages. Verni, supra, 387 N.J.Super. at 187, 903 A.2d 475.
Nonetheless, in circumstances in which the service of alcohol is not directly at issue, the courts have recognized common-law causes of action, such as negligent supervision. See, e.g., Steele v. Kerrigan, 148 N.J. 1, 7-8, 35, 689 A.2d 685 (1997) (in action for injuries caused by assault in bar, recognizing cause of action for negligent supervision); Kuehn v. Pub Zone, 364 N.J.Super. 301, 313, 835 A.2d 692 (App. Div.2003) (recognizing duty on part of bar to take reasonable precautions against the dangers posed by a motorcycle gang known for random violence), certif. denied, sub nom, Kuehn v. Kerkoulas, 178 N.J. 454, 841 A.2d 92 (2004); Martin v. Prime Hospitality Corp., 345 N.J.Super. 278, 288, 785 A.2d 16 (App.Div.2001) (Finding cause of action for negligent security or supervision against hotel bar, which allegedly failed to reasonably guard against off-premises rape of customer by another bar patron); Truchan, supra, 323 N.J.Super. at 53, 731 A.2d 1218 (recognizing viability of common law claims, but finding none available because all the claims that the plaintiff sought to assert arose out of the negligent service of alcoholic beverages); Popow v. Wink Assocs., 269 N.J.Super. 518, 520-31, 636 A.2d 74 (App. Div.1993) (finding evidence of negligent supervision sufficient to support the jury's verdict on that ground).
In the present case, the Dram Shop Act applies clearly to the conduct of the C View Inn in connection with Hamby who, the evidence suggests, was served considerable quantities of beer by Walker and, according to the testimony of Kleinschmidt, showed unmistakable signs of intoxication while in the Inn and during his departure from it. Although Walker stated at one point in her deposition that she did not recall what happened on the day at issue, evidence of the consumption of eight to twelve beers each by Hamby and Dickinson in the course of two and one-half hours, Walker's attentiveness to the needs of the table's occupants, her prompt replacement of used mugs with new, frosted ones, and the inference of her expectation of a large tip as the result of good service provide a factual basis sufficient to withstand summary judgment for the conclusion that conduct displaying inebriation was evident to Walker, but ignored as she continued to fill the drink orders of Hamby and the others. Additionally, evidence of the proximity of the table where the group was sitting to the bar, the unobstructed view of the table from the bar as the result of its location in front of the waitress station, the moderate size of the crowd at the Inn, and the relatively low noise level permit an inference that the actions of Hamby, as well as the loud behavior of both Hamby and Nesbitt were or should have been perceived by the Inn's two bartenders.
In Steele, the Court noted:
The duty of a tavern to refrain from negligently serving patrons, both before and after adoption of the Licensed Server Liability Act, has most often been recognized in the context of preventing automobile accidents. . . . In common-law cases involving taverns that serve intoxicated or minor patrons the policy discussion has generally focused on drunken driving. For example, Rappaport [v. Nichols, 31 N.J. 188, 156 A.2d 1 (1959)] noted that the foreseeability of unreasonable risk of harm to the public when alcoholic beverages are sold to a minor or intoxicated person is "particularly evident in current times when traveling by car to and from the tavern is so commonplace and accidents resulting from drinking are so frequent." 31 N.J. at 202, 156 A.2d 1. The Rappaport *890 Court cited several scholarly studies concerning automobile accidents. See ibid. Similarly, the legislative history of the Licensed Server Liability Act shows that the Legislature was largely concerned with liability for injuries caused by automobile accidents. . . . The foreseeability to taverns of automotive accidents being caused by intoxicated drivers is indisputable.
[148 N.J. at 23-24, 689 A.2d 685 (additional citations omitted).]
As a consequence, if employees of the Inn recognized or should have recognized Hamby's intoxication as the result of the visible manifestations of his condition that we have described, the Inn had a duty to protect him from foreseeable injury as the result of an automobile accident by insuring that he did not drive and that he did not ride as a passenger with a patron who was similarly impaired. Martin, supra, 345 N.J.Super. at 288, 785 A.2d 16 (observing, in the context of a rape, that the defendant bar had a duty to protect the plaintiff from foreseeable injuries by reasonable actions on the bar's part) (citing Butler v. Acme Markets, Inc., 89 N.J. 270, 280, 445 A.2d 1141 (1982) and Restatement (Second) of Torts § 344 at 225-26 cmt. f (1965)). As we stated in Martin with respect to the defendant Prime Hospitality Corporation, the owner of the bar:
Prime should have exercised reasonable care to protect plaintiff. In exercising such care, Prime should have taken reasonable steps to discover whether plaintiff was in danger or likely to be in danger and, if so, given warning or otherwise taken steps to protect plaintiff from the danger.
[Ibid.]
Both the Inn's manager, Farnan, and waitress Walker testified that the Inn's practice was to call a cab for an intoxicated patron. Farnan testified that, alternatively, the Inn permitted the patron to be driven home by a sober companion. The Inn thus regarded such precautionary actions to be reasonable on its part.
The evidence, when viewed in a light most favorable to plaintiff, suggests that, despite Hamby's intoxication, obvious in the Inn and upon his departure from it, no effort at safekeeping was undertaken by Inn personnel, either by calling a cab or by insuring that Hamby was driven home by a sober companion. Although in other circumstances an argument could be made that the Inn regarded Nesbitt's undertaking to drive Hamby home to constitute a safe alternative, in this case, there is no evidence of knowledge on the part of the Inn that Nesbitt would, in fact, be Hamby's driver. Additionally, evidence, consisting of Nesbitt's use of boisterous and inappropriate language in the Inn, his high blood alcohol concentration following the accident, and the opinion of expert Hand that Nesbitt would have shown visible signs of intoxication at 9:30 when he left the Inn provide grounds for the conclusion that, if the Inn had inquired, it would have found Nesbitt unfit to drive anywhere.[1] We therefore find sufficient evidence in the record, albeit contested, to raise a jury issue as to the Inn's liability pursuant the Dram Shop Act.

III.
Alternatively, we focus upon the Inn's liability as the result of the breach of its duty of care with respect to Nesbitt, directly. While we join the motion judge in rejecting as legally unsupported plaintiff's *891 claim that the Inn can be held liable pursuant to the Dram Shop Act as the result of constructive service of liquor to Nesbitt through the provision of the nonalcoholic set-up for a rum and Coke, we disagree with the judge's conclusion that passage of the Dram Shop Act preempted a claim by plaintiff for negligent supervision of Nesbitt by the Inn. The decisions that we have previously cited in Steele, Kuehn, Martin, Truchan and Popow clearly support the existence of this common-law cause of action in a circumstance in which evidence is lacking of negligent service of alcoholic beverages by the business entity to the tortfeasor.
Although precedent has arisen only in the factual contexts of assault and rape, we find nothing in prior decisions that would limit the availability of a cause of action for negligent supervision to these contexts, and we decline to do so. If, as the evidence we have recounted permits a jury to conclude, Nesbitt was visibly intoxicated while at the C View Inn,[2] then a duty of reasonable care for his safety arose, regardless of whether Nesbitt's intoxication resulted from the service of alcohol by the Inn or from other causes. And, for the reasons that we have previously expressed, that duty of care included a duty to protect Nesbitt from the foreseeable risk of injury to himself and others from an automobile accident by insuring that Nesbitt did not drive while in an intoxicated state. A jury could conclude that the Inn was negligent in this regard. Cassanello v. buddy, 302 N.J.Super. 267, 271, 695 A.2d 325 (App.Div.1997) (holding that the test of negligence is whether a "reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others.") (quoting Rappaport v. Nichols, 31 N.J. 188, 201, 156 A.2d 1 (1959)).
As a consequence of the foregoing analysis, we conclude that summary judgment was improvidently granted to the C View Inn in this case. Both facts and law support an imposition of liability upon it either as the result of the direct application of the Dram Shop Act or as a result of the operation of common-law principles establishing a duty of care in the circumstances presented. By vacating the order entered in this matter, we do not mean to suggest one way or another whether liability will or should be imposed by a jury. We hold only that application of recognized principles of law to the evidence can support a verdict in plaintiffs favor and against the C View Inn.
Reversed and remanded for trial.
NOTES
[1] Additionally, we have found that the tortfeasor's manner of driving after leaving the defendant bar may be probative of the tortfeasor's condition while at the bar, depending on the time interval that has elapsed. Truchan, supra, 323 N.J.Super. at 51, 731 A.2d 1218.
[2] The Court has recognized a tavern's expertise in detecting intoxication, and has contrasted it to the lesser expertise of a social host. Steele, supra. 148 N.J. at 25-26, 689 A.2d 685.